BESSEMER AND LAKE ERIE RAIL-
ROAD COMPANY, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Association of American Railroads,
Western Coal Traffic League,
Intervenors,

Central Illinois Light Company et
al., Intervenors.

ALABAMA POWER COMPANY, Georgia
Power Company, Gulf Power Company,
Mississippi Power Company, Southern
Company Services, Inc., Petitioners,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Western Coal Traffic League, Intervenor,

Central Illinois Light Company et
al., Intervenors.

CHEMICAL MANUFACTURERS
ASSOCIATION, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Western Coal Traffic League, Intervenor,

Central Illinois Light Company et
al., Intervenors.

EDISON ELECTRIC INSTITUTE,
Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Western Coal Traffic League, Intervenor,

Central Illinois Light Company et
al., Intervenors.

AMERICAN PAPER INSTITUTE,
INC., Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Western Coal Traffic League, Intervenor,

Central Illinois Light Company et
al., Intervenors.

ASSOCIATION OF AMERICAN
RAILROADS, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States,
Respondents,

Western Coal Traffic League, Intervenor,

Central Illinois Light Company et
al., Intervenors.

IOWA ELECTRIC LIGHT AND POWER
COMPANY, Iowa Power and Light
Company, Oklahoma Gas & Electric
Company, Southwestern Electric Power
Company, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Western Coal Traffic League, Intervenor,

Central Illinois Light Company et
al., Intervenors.

WESTERN COAL TRAFFIC
LEAGUE, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Carolina Power & Light Company et
al., Intervenors.

Nos. 81–1492, 81–2633 to 81–2638
and 81–2859.

United States Court of Appeals,
Third Circuit.

Argued Sept. 20, 1982.

Decided Oct. 19, 1982.

Opinion on Denial of Motion for Recall of
Mandate Jan. 26, 1983.

John G. Harkins, Jr., Thomas E. Zemaitis, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Paul A. Cunningham (argued), Robert M. Jenkins, III, Arthur W. Adelberg, Pepper, Hamilton & Scheetz, Washington, D.C., for Ass'n of American Railroads and Bessemer and Lake Erie R. Co.; Harry N. Babcock, Cleveland, Ohio, Robert B. Batchelder, Omaha, Neb., Curtis H. Berg, St. Paul, Minn., Emried D. Cole, Jr., Louisville, Ky., James L. Howe, III, Richmond, Va., Thormund A. Miller, San Francisco, Cal., Hanford O'Hara, Washington, D.C., Charles C. Rettberg, Jr., Cleveland, Ohio, James L. Tapley, Michael Thompson, J. Thomas Tidd, Richard Weicher, Washington, D.C., of counsel.

John M. Cleary, Edward J. Twomey, Nicholas J. DiMichael, Donelan, Cleary, Wood & Maser, P.C., Washington, D.C., for petitioners Iowa Elec. Light & Power Co., Iowa Power & Light Co., Oklahoma Gas & Elec. Co., and Southwestern Elec. Power Co.

John F. Donelan, John K. Maser, III, John F. Donelan, Jr., Donelan, Cleary, Wood & Maser, P.C., Washington, D.C., for American Paper Institute, the Nat. Indus. Traffic League, Carolina Power & Light Co., South Carolina Elec. & Gas Co., and Virginia Elec. and Power Co.

Frederic L. Wood, Donelan, Cleary, Wood & Maser, P.C., Washington, D.C., for American Paper Institute and the Nat. Indus. Traffic League.

William L. Slover, C. Michael Loftus (argued), Donald G. Avery, John H. LeSeur, Washington, D.C., for Western Coal Traffic League; Slover & Loftus, Washington, D.C., of counsel.

Harry H. Voight (argued), Leonard M. Trosten, Michael F. McBride, Daniel J. Con-

way, LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C., for Edison Elec. Institute.

John R. Molm, Robert P. Edwards, Jr., Michael A. Donnella, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for Southern Elec. System.

Max O. Truitt, Jr., Neil J. King, Wilmer, Cutler & Pickering, Washington, D.C., for American Iron and Steel Institute.

Gloria M. Sodaro, Washington, D.C., for Chemical Mfrs. Ass'n; Edmund B. Frost, Washington, D.C., of counsel.

Robert S. Burk, Acting Gen. Counsel, Kathleen M. Dollar, Associate Gen. Counsel, John H. Broadley (argued), Daniel B. Harrell, Atty., I.C.C., Washington, D.C., for I.C.C.

William F. Baxter, Asst. Atty. Gen., John J. Powers, III, Asst. Chief Atty. Gen., Kenneth P. Kolson, Atty., Antitrust Div., Dept. of Justice, Washington, D.C., for U.S.

J. Raymond Clark, Mary Todd Foldes, Washington, D.C., for intervenors, Central Illinois Light Co., Middle South Utilities System (Arkansas-Missouri Power Co., Arkansas Power & Light Co., Louisiana Power & Light Co., Mississippi Power & Light Co., New Orleans Public Service Inc.), Potomac Elec. Power Co., Public Service Co. of Indiana, Inc., South Carolina Public Service Authority.

James W. Lawson, William L. Howard, Washington, D.C., M. Gene Matteucci, Las Vegas, Nev., for intervenor, Nevada Power Co.

William L. Slover, C. Michael Loftus, John H. LeSeur, Kelvin J. Dowd, Washington, D.C., for amicus curiae, Consumer Owned Power Coalition; Slover & Loftus, Washington, D.C., of counsel.

Before GIBBONS, Circuit Judge, FISHER, Chief Judge * and MEANOR, District Judge.*

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Various shipper interests petition pursuant to 28 U.S.C. §§ 2321, 2342(5) to review an order of the Interstate Commerce Commission (ICC) adopting a standard of revenue adequacy for market dominant carriers.[1] Ex Parte No. 393, *Standards for Railroad Revenue Adequacy,* 364 I.C.C. 803 (1981). Several carrier interests petition to review the same order.[2] The shipper interests contend that in several respects the order is more generous to the carriers than the law permits. The carrier interests, while generally defending the order, contend that the ICC erred in its treatment of rail properties currently unused or unuseful. We hold that the carrier petition presents issues not ripe for judicial review. As to the petitions of the shipper interests, we affirm the ICC order.

### I.

#### The Regulatory Scheme

In 1976, confronting the total collapse of the railroad industry in the Northeast, Congress enacted the Railroad Revitalization and Regulatory Reform Act. Pub.L.No.94–210, 90 Stat. 31 (hereinafter 4R Act). Two salient features of that legislation are relevant to the disposition of the instant petitions.

The first is the provision that:
[n]otwithstanding any other provision of this part, no rate shall be found to be just and reasonable, on the ground that such rate exceeds a just or reasonable maximum for the service rendered or to be rendered, unless the Commission has first found that the proponent carrier has market dominance over such service.

Pub.L. 94–210, § 202(b), equivalent codified

---

* Hon. Clarkson S. Fisher, Chief Judge, and Hon. H. Curtis Meanor, District Judge, United States District Court for the District of New Jersey, sitting by designation.

1. The shipper petitioners include businesses dependent upon, or trade organizations whose members are dependent upon, rail shipment of bulk commodities such as coal, iron ore, chemicals, and pulpwood.

2. The carrier petitioners include Bessemer and Lake Erie Railroad Company and the Association of American Railroads.

at 49 U.S.C. § 10701a(b)(1) (1982). The effect of this provision was to end for most rail service decades of ICC control over maximum rates and to permit carriers not having market dominance to set rates in response to their perception of market conditions. Market dominance was defined as "an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which the rate applies." Pub.L. 94–210, § 202(c)(i). *See* 49 U.S.C. § 10709(a) (1982). The ICC has determined that there is effective competition for the traffic or movement to which a rate applies from (1) carriers or modes of transportation, serving the same origin and destination; (2) carriers or modes of transportation delivering the same product from the same origin to alternative destinations; (3) carriers or modes of transportation delivering the same product to the same destination from alternative origins; and (4) carriers or modes of transportation delivering substitute products to the same destination, irrespective of origin. 49 C.F.R. Part 1109; Ex Parte No. 320 (Sub-No. 2), *Market Dominance Determinations and Considerations of Product Competition,* 365 I.C.C. 118, 129 (1981). Thus the category of market dominant carriers is a narrow one, involving services to shippers who by virtue of location and inability to use substitute products are captive customers of a rail carrier.

The second salient feature of the 4R Act is the enactment of a section dealing with the standard for ratemaking for those market dominant carriers still subject to ICC ratemaking jurisdiction. Section 205 of that Act directed the ICC:

within 24 months after the date of enactment of this paragraph, after notice and

an opportunity for a hearing, [to] develop and promulgate (and thereafter revise and maintain) reasonable standards and procedures for the establishment of revenue levels adequate under honest, economical, and efficient management to cover total operating expenses, including depreciation and obsolescence, plus a fair, reasonable, and economic profit or return (or both) on capital employed in the business.

Congress directed, further, that:

[s]uch revenue levels should (a) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation and (b) insure retention and attraction of capital in amounts adequate to provide a sound transportation system in the United States.

Acting under the mandate of section 205 the Commission conducted two revenue adequacy proceedings, to which more particular reference will be made hereafter.[3] Meanwhile two major midwestern railroads went bankrupt, necessitating emergency federal legislation.[4] Congress, apparently dissatisfied with the pace of the ICC's revenue adequacy proceedings, passed the Staggers Rail Act of 1980, Pub.L. 96–448, 94 Stat. 1895 (hereinafter the Staggers Act). That Act amended the 4R Act in several respects. In an effort to increase railroad revenues, it created zones of rail carrier rate flexibility in which even market dominant carriers, if found to be revenue inadequate, could increase rates without ICC approval.[5] The Staggers Act also amended

---

**3.** Ex Parte No. 338, Standards and Procedures for the Establishment of Adequate Railroad Revenue Levels, 358 I.C.C. 844 (1978); Ex Parte 353, Adequacy of Railroad Revenue (1978 Determination), 361 I.C.C. 79 (1978); 362 I.C.C. 199 (1979).

**4.** See Rock Island Transition and Employee Assistance Act, Pub.L. 96–254, 94 Stat. 399 (1980); Milwaukee Railroad Restructuring Act, Pub.L. 96–101, 93 Stat. 736 (1979).

**5.** Pub.L. 96–448 § 203. Revenue inadequate carriers were authorized to increase rates on

services otherwise subject to ICC rate control as follows:

(c)(1) During the 12-month period beginning on the effective date of the Staggers Rail Act of 1980 and during each of the 3 succeeding 12-month periods, a rail carrier may, in addition to rate increases authorized under subsection (b) of this section, increase any rate over which the Commission has jurisdiction under section 10709 of this title by an annual amount of not more than 6 percent of the adjusted base rate, except that in no

section 205 of the 4R Act to provide that "[t]he commission shall maintain *and revise as necessary* standards and procedures for establishing revenue levels." Pub.L. 96–448, § 205(b)(1). Moreover the ICC was directed to conclude a section 205 proceeding within 180 days after the effective date of the Staggers Act. Pub.L. 96–448 § 205(b)(3). The effect of an ICC determination that a carrier is revenue inadequate, therefore, is to permit rail carriers to raise rates on services as to which they have market dominance, without ICC approval, within the zones of flexibility specified in the statute.

## II.

### The ICC Decision

Ex Parte No. 393 which we review is the ICC's response to the Staggers Act direction that it conclude a section 205 proceeding within 180 days. On December 3, 1980 the ICC issued a notice proposing to repeal its governing revenue adequate reg-

ulations and to adopt a new standard measure. 45 Fed.Reg. 80150 (1980). Departing from the approach it took in two prior revenue adequacy proceedings, it determined that a railroad would be considered revenue adequate when it received a rate of return on net investment equal to the current cost of capital. It determined to measure current cost of capital by examining current cost of debt, rather than embedded or historical cost of debt, together with current cost of equity. In determining the rate base the ICC included reserves for deferred taxes, authorized use of betterment accounting for valuation of track assets, valued other assets at depreciated book value, and included in the investment base unused and unusable rail assets. In calculating the cost of capital and rate base the ICC used the most recent data available; the operating results and cost of capital for 1979.

The adoption of current cost of capital as the sole rate of return standard is a modifi-

---

event shall the total increase under this subsection result in a rate which is more than 118 percent of the adjusted base rate.

(2)(A) If any portion of a rate increase under this subsection is not implemented in the year in which it is authorized, such portion may, except as provided in subparagraph (B) of this paragraph, be implemented only in the next succeeding year.

(B) If any portion of the total rate increase authorized under this subsection is not implemented by the end of the 4-year period beginning on the effective date of the Staggers Rail Act of 1980, such portion may be implemented in the next 2 succeeding years, except that in no event may a rail carrier increase a rate under this subsection or under subsection (d) of this section in either of such 2 succeeding years by an annual amount of more than 10 percent of the adjusted base rate.

(d)(1) Except as provided in paragraph (3) of this subsection, during the 12-month period beginning on October 1, 1984, and during each succeeding 12-month period, a rail carrier may, in addition to rate increases under subsection (b) of this section, increase any rate over which the Commission has jurisdiction under section 10709 of this title by an annual amount of not more than 4 percent of the adjusted base rate.

(2) No portion of any rate increase under this subsection which is not implemented in the year in which it is authorized may be implemented in any other year.

Additionally, section 203 created "zones of rail carrier rate flexibility." 49 U.S.C. § 10707a.

(c)(1) Any rail carrier rate which increased over 70 percent between 1976 and 1979 inclusive for the transportation, in shipper owned equipment over a distance exceeding 1,550 miles between points within the United States, of coal pursuant to a tariff calling for an annual volume of more than 2,000,000 tons per year purchased by a municipally owned utility for the generation of electric power under a 20-year purchase agreement entered into by such utility in the year 1974 shall not be increased so long as coal is purchased under such original agreement, except that—

(A) during the period beginning October 1, 1980, and ending September 30, 1987, the Interstate Commerce Commission may permit increases in such rate which result in a revenue-variable cost percentage of not more than 162 percent; and

(B) after October 1, 1987, such rate shall be subject to section 10701a of title 49, United States Code, and related provisions of such title governing regulation of rail carrier rates, except that until such rate results in a revenue-variable cost percentage that is equal to or greater than the revenue-variable cost percentage applicable under section 10709(d) of such title, such rate may not be increased more than 4 percent, in addition to inflation, in any year.

cation of the approach taken by the ICC in Ex Parte No. 338, the first of its section 205 proceedings. In that case the commission indicated that "[a]dequate revenue determination for railroads, ... should not be based simply on a rate of return at the cost of capital rate." 358 I.C.C. at 872. It also proposed to consider certain financial ratios as indicative of a railroad's ability to raise capital. These included fixed charge coverage, proportion of debt in the capital structure, return on shareholders' equity, and ratio of market value of common stock to book value. 358 I.C.C. at 859. Moreover the ICC proposed to use flow of funds analysis, which projects needed capital outlays and other fund requirements, determines funds available from operations and capital sources, and ascertains the extent to which such funds will fall short of projected fund requirements. This group of standards was also utilized in Ex Parte 353. 361 I.C.C. 79 (1978), 362 I.C.C. 199 (1979). In Ex Parte 393 the ICC justifies its elimination of the consideration of ratios, and of flow of funds analyses, as inappropriate indicators of long term revenue adequacy. 364 I.C.C. at 817.

### III.

#### Scope of Review

 The ICC's revenue adequacy standard is a product of notice and comment rulemaking. 5 U.S.C. § 553(c). The rulemaking proceeding was unquestionably within the ICC statutory jurisdiction. We may set aside its action, therefore, only if it is arbitrary, capricious, an abuse of discretion, or otherwise not according to law, or if it was adopted without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D). We may not weigh the evidence before the ICC, or inquire into the wisdom of the promulgated regulations, and we may inquire into the soundness of the ICC's reasoning only to the extent of ascertaining that its conclusions are rationally supported. *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972); *Baltimore and O. C. T. R. Co. v. United States,* 583 F.2d 678, 685 (3d Cir. 1978). Moreover, even when ICC rulemaking represents a

departure from that agency's prior position, so long as the policies it is pursuing can be discerned from its opinion, and those policies are consistent with congressional directives, we must defer to the ICC's agency judgment. *Atchison T. & S. F. R. Co. v. Witchita Bd. of Trade,* 412 U.S. 800, 809, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973). The choice by an agency among alternative means for satisfying a statutory mandate is exclusively for that agency. Within the limits of this highly deferential scope of review, we turn to the petitioners several objections.

### IV.

#### The Shipper Objections

The shipper objections may conveniently be divided into two categories; those bearing upon the ICC's adoption of a single rate of return standard for revenue adequacy, and those bearing upon determination of the rate base against which that return is calculated. We address them in that order.

#### A. The Standard of Revenue Adequacy

In Ex Parte 393 the ICC supported its conclusion that the standard for revenue adequacy should be a rate of return equal to the cost of capital by noting:

> Such a standard is widely agreed to be the minimum necessary to attract and maintain capital in the railroad, or any other, industry. The cost of capital is the rate of return required of a firm by current and prospective holders of its securities. If a firm is unable to earn the cost of capital, investors will be unwilling to supply capital to it. (footnote omitted).

364 I.C.C. at 809. The ICC reviewed the verified statement of William J. Baumol, which it credited, that any decision which foreclosed the opportunity to earn a compensatory rate of return on a railroad's capital would guarantee deterioration of plant and equipment, neglect of replacement and opportunities for modernization, and withdrawal of railroad services valued by customers. It then reasoned:

Railroads can obtain funds for investment only by offering rates of return comparable to other investment opportunities. Otherwise, investors will elect to invest their funds elsewhere. If railroads earn less than adequate rates of return because of inappropriate regulatory action, rather than because they are not providing a desired service, then the standards of the Rail Act and the clear thrust of congressional policy will be thwarted.

The minimum rate of return that will allow railroads to obtain investment funds is the cost of capital. The cost of capital is, by definition, the rate at which the market values investment funds. As we have said, investments earning less than the cost of capital will, in general, not maintain existing funding nor obtain new funding because investors will have sufficient opportunities to invest their funds elsewhere at a higher rate of return. It is extremely important to add, however, that this is true of funds generated internally as well. Railroad management has little incentive to reinvest funds generated by ratepayers in continued rail use if greater returns are available elsewhere. Railroads are private companies whose stockholders would not permit such reinvestment. Thus, even retained earnings will not be invested in the company if they cannot earn a rate of return equal to the cost of capital.

364 I.C.C. at 810.

The shipper interests mount several attacks upon the decision to opt for a single standard, some procedural and others substantive.

### 1. Adequacy of Notice

■ Some shippers contend that the ICC notice of proposed rulemaking published in the Federal Register, 45 Fed.Reg. 80150 (1980) did not comply with 5 U.S.C. § 553(b)(3). That section requires notice "either of the terms or substance of the subjects and issues involved." We have held that the statute requires a notice in sufficient detail to alert properly all interested parties as to important particulars affecting them, and thus to permit those parties to comment before being subjected to regulations. *Marshall v. Western Union Telegraph Company,* 621 F.2d 1246, 1254 (3d Cir. 1980); *American Iron & Steel Const. v. EPA,* 568 F.2d 284, 293 (3d Cir. 1977); *Wagner Electric Corporation v. Volpe,* 466 F.2d 1013, 1019 (3d Cir. 1972). We conclude that the notice adequately complied with the standards for notice laid down in this court's caselaw. Plainly it alerted shipper interests that the ICC perceived difficulties with the use of ratios, and flow of funds analyses. Moreover it gave explicit notice that the ICC considered the current cost of capital to be the "minimum rate necessary to attract and maintain capital in the railroad, or any other industry." 45 Fed.Reg. at 80152. That no more explicit notice was required is confirmed by an examination of the detailed comments actually received.

### 2. Absence of Codification

■ Some shippers contend that the ICC violated 49 U.S.C. § 10704(a)(2), which requires that it "maintain and revise as necessary standards and procedures for establishing revenue levels for rail carriers," by declining to codify its revenue adequacy standards. The ICC held, and we agree, that neither the 4R Act as amended by the Staggers Act, nor any provision of the Administrative Procedure Act requires a specific format for a revenue adequacy determination. The agency provided notice in the Federal Register and an opportunity for comment. It published its decision, and provided Federal Register notice of its issuance. The public has been adequately informed as to how the ICC will make determinations of revenue adequacy. Codification in the Code of Federal Regulations might be appropriate, but certainly is not essential to the legality of the decision in Ex Parte No. 393.

### 3. Legality of a Single Standard

■ The shipper interests maintain that in adopting a rate of return equal to the current cost of capital as the single standard for revenue adequacy the ICC misinterpreted section 205. They point out that

the only change which the Staggers Act made in section 205 of the 4R Act was the addition of the language "revise as necessary." This language, they urge, while it did contemplate possible revisions of the revenue adequacy standards announced in Ex Parte No. 338 and No. 353, did not mandate the elimination of ratios or of flow of funds analysis. Those standards, they insist, were required by section 205 as it originally appeared in the 4R Act. Chief reliance is placed on the sentence:

Such revenue levels should (a) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure repayment of a reasonable level of debt, permit the raising of needed equity capital and cover the effects of inflation and (b) insure retention and attraction of capital in amounts adequate to provide a sound transportation system in the United States.

Reliance is also placed on the reference in the prior sentence to "honest, economical and efficient management." Pub.L. 94–210 § 205(2). In support of their interpretation of the quoted language the shippers refer to language in Senate and House reports on the 4R Act. The Senate report explains:

In considering adequate revenue levels, the Commission will be expected to utilize the most modern financial techniques available and to adopt a prospective view of carrier revenue needs. Previous analysis of the adequacy of regulated industry revenues has focused upon adequate returns on investment. While this type of analysis may need to be continued, it is equally important for the Commission to focus on the level of revenue needed to provide and maintain adequate service in the public interest. This requires emphasis upon present and future revenue levels under honest, economical and efficient management as opposed to a theoretically adequate rate of return on investment that may have no relationship to the need for operating and capital funds necessary to maintain service in the public interest. S.Rep.No.94–499: Report to the Senate Committee on S. 2718, Rail Services Act of 1975, November 26, 1975, pp. 51–52. House

Report No. 94–725, 94th Cong. 1st Sess. 73 (1975) states:

In carrying out one of the primary objectives of this legislation, the reported bill amends ... the Interstate Commerce Act ... to require that the Commission establish standards for the establishment and maintenance of adequate revenue levels for railroads .... Needless to say, in establishing such standards, the Commission shall take into consideration productivity factors and financially sound debt and equity ratios.

The shippers contend that in light of this legislative history section 205 must be read as requiring separate standards addressed to financial ratios, to flow of funds analysis, and to productivity. They make this contention, obviously, in hopes that utilization of these additional standards will produce a level of revenue adequacy lower than that resulting from application of the current cost of capital standard. This, they hope, will prevent more carriers from taking advantage of the zones of rate flexibility in 49 U.S.C. § 10707a. The shippers do not dispute that the ICC standard will provide an opportunity to attain revenue levels at least equal to those which might be authorized if the other proposed standards were employed.

The ICC interprets section 205 differently. It concludes that the section was addressed to the *opportunity* to attain revenue levels which would reverse the long decline in the railroad industry. The specific objectives listed in section 205 should not in its view be read as limitations on revenue, and may all be attained under the current cost of capital standard. The ICC urges, as well, that the Staggers Act was intended to create a regulatory environment more favorable to investment in railroads. Congress' concern was "to reform Federal regulatory policy so as to preserve a safe, adequate, economical, efficient and financially stable rail system" and "to assist the rail system to remain viable in the private sector of the economy." Pub.L. 96–448, §§ 3(2) and (3), 94 Stat. 1897. Despite the use of financial ratios and of flow of funds

analysis in Ex Parte Nos. 338 and 353, the economic difficulties of the railroad industry continued under the 4R Act. Thus, the ICC points out, adoption of the more all encompassing current cost of capital standard was suggested by experience. As to productivity and honesty in management, it reads the statutory references to those matters as expressions of concern that carriers with honest, economical and efficient management have the opportunity to achieve adequate revenues. If the management is not honest, economical and efficient it will not, despite such opportunity, attract capital or retain business.

Given the highly deferential scope of review by which this court is confined, we cannot hold that the adoption of a single standard encompassing the objectives listed in section 205 must be set aside. The overall policy pursued by the agency is entirely consistent with Congressional directives. Reasons for departure from the ICC's prior position with respect to use of financial ratios and flow of funds analysis, and for refraining from incorporating productivity standards under section 205, have been carefully explained. While some other standard or combination of standards might also accomplish the overall objectives of the 4R and Staggers Acts, the choice among permissible alternatives is to be made by the agency to which rulemaking authority has been delegated, not by this court.

The shippers urge that the ICC's interpretation of section 205 puts them, as customers of market dominant carriers, entirely at the mercy of those carriers. That contention ignores the distinction in the statute between revenue adequacy proceedings and rate reasonableness proceedings. Carriers determined to be revenue inadequate may, without ICC approval, raise rates within the zones of reasonableness set out in 49 U.S.C. § 10707a. Individual shippers who object to specific rates may file complaints against market dominant carriers challenging the reasonableness of such rates. 49 U.S.C. §§ 11701(b), 11705. In such proceedings the ICC retains authority to prevent imposition of unreasonable rates on market dominant traffic. Among the factors which it may consider in rate reasonableness proceeding are the inefficiency or dishonesty of the carriers' management, and discrimination in rates which may result in subsidizing competitive traffic with charges imposed on captive shippers. As the ICC points out, a revenue adequacy determination is no guarantee that any carrier will attain any level of revenue.

Thus, we conclude that the ICC's adoption of the single standard of revenue adequacy—a rate of return equal to the current cost of capital—is consistent with section 205, and is not arbitrary, capricious, or an abuse of discretion.

### 4. Current vs. Embedded Debt

Perhaps the most strenuously voiced shipper objection to the ICC's standard is its reliance on current cost of debt capital instead of cost of embedded debt. The shippers do not object to looking to the current market for the proper return on equity investment. Nor do they object to the ICC's assumptions about a proper ratio between debt and equity investment in the railroad industry. They do object, however, that by looking to the current cost of debt, when many carriers owe debt which was contracted for years ago at lower interest rates, the ICC is affording to the stockholders the opportunity to make a return on investment represented by debt in excess of its cost.

The ICC's position is entirely consistent with section 205, and with the overall scheme of regulation of the 4R and Staggers Acts. In an unregulated industry it would be the object of management, by judicious resort to borrowed funds, to make capital investments which properly utilized would earn in excess of the cost of borrowed funds, thereby providing leverage for stockholder investors. Public utility regulation, by contrast, provides for an assured rate of return to regulated monopolies. In fixing an assured rate of return, it is not unfair to take into account only the embedded cost of debt. Railroad regulation by the ICC, is not, however, classic public utility regulation. For the most part railroads

operate in a competitive environment. It is true that under the 4R and Staggers Acts they are subject to regulation of rates for market dominant traffic. They are not, however, assured of a compensable rate of return even on the investment required to serve that traffic. The purpose of the revenue adequacy determination required by section 205 is to determine which railroads may resort to the flexibility in raising rates provided for elsewhere in the statute. Revenue from all traffic, competitive as well as market dominant, is taken into account for that purpose. There is no reason to suppose that Congress intended to restrict railroads having market dominance in specific instances to a level of revenue determined by its embedded cost of debt service. Such an interpretation of the statute would be inconsistent with the expressed intent of opening capital markets to the railroads, and of encouraging reinvestment of internally generated funds. If the railroads could not gain a rate of return on investment represented by old debt in excess of the old interest rates on such debt, they would be unlikely to attract new equity capital, and their shareholders would insist on investment of internally generated funds outside the rail industry.

Several shippers contend that by using current cost of debt in the revenue adequacy determination the ICC will tend to overcompensate carriers in times of high interest rates, while undercompensating them when their embedded interest rates exceed current rates. We have already rejected the contention that the carriers may not enjoy leverage resulting from judicious earlier borrowing. As to the effect of the ICC's standard should interest rates collapse, the shippers' expressed concern is unrealistic. If old debt carries interest rates exceeding the current market, prudent management will replace it with new borrowings.

Thus, we conclude that the ICC decision to use current cost both of debt and of

equity capital in determining an adequate rate of return is consistent with section 205, and is not arbitrary, capricious, or an abuse of discretion.

### B. The Investment Base

The shipper interests contend that several ICC rulings with respect to determination of the investment base to which its rate of return shall be applied are arbitrary, capricious, an abuse of discretion, or contrary to law.

### 1. Use of Betterment Accounting for Track Structures

 In its notice of proposed rulemaking the ICC proposed using the sum of original cost plus betterments for the valuation of track structures, explaining that such numbers are readily available for railroads, while capitalized maintenance and depreciation numbers are not.[6] 45 Fed.Reg. at · 80152. For all accounts using depreciation accounting it proposed using depreciated book value. *Id.* Several shippers urge that the ICC should have adopted depreciation accounting for track structures as well as for other assets, because betterment accounting may lead to overgenerous estimates of the value of an investment base, and to inaccurate reports of railroad profits. Although the ICC has recently indicated a willingness to reconsider the use of betterment accounting, in Ex Parte 393 it concludes:

> In continuing to think about this issue, we have grown more convinced that betterment accounting may underestimate— not overestimate—the value of the investment base. Track structure is valued at the original cost of the track at the time the original investment was made, plus betterments (valued at their original cost). Under depreciation accounting, track structure would continually be revalued. Due to inflation, track structure would, therefore, likely be valued at a

---

**6.** The ICC has explained betterment accounting as follows:

> Under [betterment accounting], the initial track installation cost is capitalized. This investment is not depreciated and remains in the property investment account until the track is abandoned under the theory that the track structure is maintained in a constant condition and depreciation expense would equal track maintenance costs. Instead of depreciation, track replacements are

accounted for as track maintenance expenses, except if through the application of superior component parts (such as replacing 110-lb. rail with 132-lb. rail) a betterment occurs. In that instance, the excess cost of new parts over the current cost of new parts of the kind replaced is capitalized.

*Alternative Methods of Accounting for Railroad Track Structures,* 46 Fed.Reg. 32289 (1981).

higher level under depreciation accounting because its value is set at a later date. 364 I.C.C. at 812. The ICC acknowledged that the practice of considering all track maintenance except betterments to be an expense could overstate profits in periods of low maintenance and understate profits in periods of high maintenance. It concluded that it lacked information as to the direction or magnitude of these distorting effects, and that the betterment accounting data are the best currently available. *Id.* at 813.

Considering our limited scope of review, the industry practice of using betterment accounting for track structures, and the Congressional direction to the ICC in the Staggers Act to complete a revenue adequacy proceeding in 180 days, we cannot hold that the agency's decision to calculate the value of track structures by betterment rather than depreciation accounting should be set aside.

### 2. Failure to Exclude Unused or Useless Assets from the Rate Base

■ Some shippers urge that the ICC erred in failing to exclude from the railroads' rate base assets which have not been formally abandoned, but which are nevertheless unused or useless. The statutory standard is "a reasonable and economic profit or return (or both) on capital employed in the business." 49 U.S.C. § 10704(a)(2). In deference to that standard the ICC noted that it "must be careful not to overvalue the investment base by including in it assets that are neither used nor useful." 364 I.C.C. at 811. But because the Staggers Act required a revenue adequacy determination within 180 days the agency found it impossible to distinguish used and useful plant from that which was neither. It advanced two justifications for inclusion of all assets not formally abandoned at original cost plus betterments for track assets, and depreciated book value for all other assets. First, it found that the book value of unused and unuseful assets was significantly less than one percent of total net investment. Second, it found that railroads with the highest percentage of abandonable lines have had low profits, and thus are likely to be found revenue inade-

quate in any event. There is evidence in the record supporting both findings.[7]

We conclude that in determining for purposes of section 205 what capital is "employed in the business" of a railroad, the ICC has acted within the bounds of the discretionary authority conferred on it by Congress. The agency noticed for comment the question of possible unused and unuseful assets. 45 Fed.Reg. 80152–53. On the basis of information submitted in response to the notice it concluded that no adjustment to the book values of the investment base was necessary at this time, because no likelihood of substantial overvaluation was established. Thus we hold that the failure to calculate and exclude value of unused or unuseful assets, for purposes of the initial revenue adequacy determination mandated by the Staggers Act, was not arbitrary, capricious, or an abuse of discretion.

### 3. Reserves for Deferred Taxes

■ Under the Internal Revenue Code railroads, like other businesses, are permitted to take accelerated depreciation deductions. 26 U.S.C. § 167(b). The effect of accelerated depreciation is to leave in the business, temporarily, funds which under normal depreciation funds accounting methods would be paid out as taxes on earnings. The tax benefit, assuming continuing profitable operations, is temporary, since in later years the unavailability of depreciation allowances on assets for which accelerated depreciation was elected results in higher income. In effect, by deferring the collection of taxes the federal government makes a temporary investment in the business.

The shipper interests contended before the ICC, and urge here, that reserves for deferred taxes should be excluded from the rate base. In making this argument, they urge adoption by the ICC of an accounting procedure utilized by some public utility regulatory bodies called normalization. Normalization means that a regulated utility, while it may calculate its tax liability using accelerated depreciation, must for rate making purposes report depreciation and earnings on a straight-line basis. *See* E. Warren, *Tax Accounting in Regulated Industries: Limitations on Rate Base Exclusions,* 31 Rutgers L.Rev. 187, 190 (1978). Normalization accounting results in passing

7. Statement of Charles W. Hoppe, "The Extent of Excess Capacity," V.S. # 3, Comments of American Association of Railroads, at 7–8.

through to utility customers the tax savings resulting, temporarily, from accelerated depreciation.

In many respects the shippers' plea for normalization accounting for depreciation is similar to their plea for use of embedded rather than current cost of debt. By not deducting from the rate base a reserve for unpaid taxes, the ICC is permitting the railroads to earn for their stockholders a return on money the United States has temporarily invested in the enterprise. Since those funds are cost free, according to the shippers, no rate of return should be allowed on them.

The simple fact remains, however, that for all businesses accelerated depreciation is a source of funds which may be reinvested. If the railroad industry were to be put in the position that unlike unregulated industries it could not earn a rate of return on investment of such funds, it would be at a competitive disadvantage in seeking equity capital, and it would be encouraged to invest the funds generated from accelerated depreciation elsewhere than in the railroad business. Perhaps in balancing the competing interests for shippers and rail carriers a commission decision excluding reserves for deferred taxes from the rate base would be a defensible interpretation of section 205. Indeed that was the ICC's earlier position.[8] In Ex Parte No. 347 (Sub-No. 1), *Coal Rate Guidelines Nationwide*, 364 I.C.C. 360 (1980), however, it reconsidered that position. Both in that case and in Ex Parte 393 it recognized that excluding deferred taxes from the rate base would provide an incentive for railroads to invest in non-rail assets. It would, moreover, produce a rate of return below the cost of capital, since capital markets act with knowledge of the availability of accelerated depreciation as a source of funds.

The ICC's position on normalization of depreciation accounting is rationally supported. Its reasons for departure from its prior position are adequately explained, and its present policy is consistent with the Congressional directive in section 205. We may not disturb its decision respecting reserves for deferred taxes.

## V.

### Carrier Objections

 Some carriers object that the ICC opinion recognizing that some rail lines are

so unused or unusable as to be potentially abandonable, intimated that in the future it might determine that unused or unusable lines ought to be excluded from the rate base for purposes of revenue adequacy determinations. They contend that so long as they are under a legal obligation to retain rail property, whether or not it is used or useful, its book value must as a matter of law be included as "capital employed in the business." 49 U.S.C. § 10704(a)(2). The ICC points out, correctly, that no abandonable properties were excluded from the rate bases dealt with in Ex Parte 393. In its opinion the ICC observed:

> We have ... decided, for purposes of this initial assessment, to use a method of asset valuation that does not explicitly address the question of identifying used and useful plant. We do this only because we believe such identification is not possible in the time allowed and because we believe that the valuation that will result from use of the method we are adopting is accurate.

364 I.C.C. at 811. Whether in the future any potentially abandonable properties will be excluded from the rate base is, at this point, entirely a matter of speculation. Thus we conclude that the carrier petition for review challenging the legality of any such exclusion presents an issue which is not ripe for judicial review. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *West Penn Power Co. v. Train*, 522 F.2d 302 (3d Cir. 1975).

The carrier interests also urge that the ICC erred when in deciding Ex Parte 393 it relied upon cost of capital and operating results for 1979. Under the strict deadline for decision included in the Staggers Act, however, the ICC had no real choice but to rely on the most recent figures on operating results which were available; those for 1979. It could have relied upon information about capital costs in 1980, but its decision to utilize capital costs for the same year as the operating results upon which its revenue adequacy determinations were to be based was not an abuse of discretion.

## VI.

### Conclusion

The decision of the ICC in Ex Parte 393, 364 I.C.C. 803 (1981) will be affirmed in all respects.

---

8. See *San Antonio Texas v. United States*, 631 F.2d 831, 847 (D.C.Cir.1980).

## Opinion on Denial of Motion for Recall of Mandate

Certain petitioners in the above entitled case move to recall the mandate of this court and to schedule the case for reargument. Our judgment was entered on October 19, 1982, petitions for rehearing were denied by order dated November 2, 1982, and a certified judgment in lieu of mandate issued on December 3, 1982. The ground asserted in support of the motion is that by Section 103(b) of the Federal Courts Improvement Act of 1982, Public Law 97–164, 96 Stat. 25, April 2, 1982, 28 U.S.C. § 46(b) was amended to provide:

> In each circuit the court may authorize the hearing and determination of cases and controversies by separate panels each consisting of at least three judges at least two of whom shall be judges of that court, unless such judges cannot sit because recused or disqualified, or unless the chief judge of that court certifies that there is an emergency including, but not limited to, the unavailability of a judge of the court because of illness.

The moving parties point out that in this instance the panel included two judges of the United States District Court for the District of New Jersey.

When the petitions were filed the Clerk of this Court, pursuant to the court's standard practice, circulated copies of the docket sheets to determine whether or not members of the court were recused pursuant to 28 U.S.C. § 455. All active judges except Judge Gibbons indicated that they were disqualified. In addition Senior Judges Van Dusen and Rosenn indicated disqualification. Senior Judge Albert B. Maris does not ordinarily sit in cases requiring oral argument. The court was aware of the provisions of Public Law 97–164, and of its effective date of October 1, 1982. Since, however, only one member of the court was eligible to hear the cases, on August 12, 1982 Chief Judge Seitz, pursuant to 28 U.S.C. § 292(a), designated Chief Judge Clarkson S. Fisher and Judge H. Curtis Meanor to hear them. Orders containing those designations are on file in the Office of the Clerk of this Court.

The motion to recall the mandate and to schedule the cases for reargument will be denied.