Rosa Ingrid Perez Fernandez DeBRAUN, t/a Immigration Information Services

v.

Doris MEISSNER, Commissioner, Immigration and Naturalization Service and M. Frances Holmes, Acting District Director, Philadelphia District.

Civil Action No. 96–7340.

United States District Court,
E.D. Pennsylvania.

March 28, 1997.

Michael E. Scullin, Philadelphia, PA, for plaintiff.

Kristal A. Marlow, Office of Immigration Litigation, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

This case involves a challenge to a regulation promulgated by the Immigration and Naturalization Service to overcome problems arising from the taking of immigrants' fin-

gerprints. Presently before me is defendants' motion to dismiss the complaint for failure to state a claim and for judgment on the pleadings. Plaintiff opposes that motion and, in the alternative, requests judgment on the pleadings with respect to the adequacy of the notice and comment procedures followed by the defendants in promulgating that regulation. For the reasons that follow, I will deny defendants' motion and grant plaintiff's motion.

## I. Background [1]

Since 1992, the plaintiff, Rosa Ingrid Perez Fernandez DeBraun, individually and trading as Immigration Information Services, has provided fingerprinting and photography services for immigrants and others at three different locations in Philadelphia, Pennsylvania: two permanent offices and a mobile recreational vehicle which, since 1992, she has routinely parked on 16th and Callowhill, immediately in front of the Immigration and Naturalization Service (INS) district office. Applicants for various types of immigration benefits must submit fingerprints with their application. The INS then sends the fingerprints to the Federal Bureau of Investigation which checks to see if the applicant has a criminal history, thereby rendering the applicant ineligible for benefits. In the past, INS district offices were responsible for fingerprinting all applicants. However, because available funding dwindled and the number of applications increased, outside providers have recently assumed the majority of the fingerprinting services.

Pursuant to an investigation by the Department of Justice's Office of Inspector General, which uncovered problems regarding fingerprint quality, the INS decided to regulate the fingerprinting process. In light of that goal, on May 15, 1995, the INS proposed a regulation, which it publicized in the Federal Register, and solicited comments from the public. *See* Certification of

Designated Outside Entities to Take Fingerprints, 60 Fed.Reg. 25,856 (1995) (to be codified at 8 C.F.R. §§ 103 & 299) (proposed May 15, 1995). Through the regulation, the INS hoped that by certifying outside services to take the fingerprints of applicants for immigration benefits, it would facilitate the processing of the applications and "protect the integrity of the fingerprinting process while relieving the strain on Service resources." *Id.* Among other requirements, the proposed regulation stated that the fingerprinting service must "[m]aintain clean and suitable facilities that are accessible to the general public." *Id.* at 25,862 (citing proposed 8 C.F.R. § 103.2(e)(6)(xviii)). The public comment period ended in July of 1995. Without further notice or comment and almost one year later, on June 4, 1996, the INS published its final rule. As promulgated, section 103.2(e)(6)(xviii), the section contested by Ms. DeBraun, provides that the designated fingerprinting services (DFS) must "[m]aintain facilities which are permanent and accessible to the public. The use of the terms permanent and accessible to the public shall not include business or organizational operations in private homes, vans or automobiles, mobile cars, and removable stands or portable storefronts." Certification of Designated Fingerprinting Services, 61 Fed.Reg. 28,003, 28,012 (1996) (codified at 8 C.F.R. § 103.2(e)(6)(xviii)).

Ms. DeBraun's attorney wrote a letter to the INS inquiring whether a new round of public commentary would occur because, in his client's view, the requirement of permanency and the exclusion of operations in vans were material changes from the proposed regulation.[2] The INS did not respond to the letter.

Subsequently, Ms. DeBraun applied for certification as a fingerprinting service for her two permanent offices and the mobile van. The Philadelphia District Office of the

---

1. In their motion, the defendants do not contest the material facts alleged by the plaintiff, nor do they contest the procedures allegedly followed by the Immigration and Naturalization Service (INS) in promulgating its regulation. Rather, the defendants contest the plaintiff's legal conclusions based upon those facts.

2. Ms. DeBraun did comment on the proposed rule but never addressed the issues of permanency or physical structure of the provider's operations.

INS certified her two permanent offices, but on February 25, 1997, the district office denied her application with respect to her mobile facility. Accordingly, after March 31, 1997, the INS will no longer accept fingerprints taken in her van.[3]

Basing her complaint primarily on the Administrative Procedures Act,[4] Ms. DeBraun claims that the INS' conduct "in promulgating the Rule in question was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law." (Compl. ¶ 37). She states that the INS' action was "contrary to constitutional right, power, privilege, or immunity," (*id.* ¶ 38), that the INS acted in excess of its statutory authority, and that the INS failed to observe the procedures required by law. (*Id.* ¶¶ 39–40). In addition, she makes several other claims not relevant here.[5]

## II. Standard of Review

■■■■■ Ms. DeBraun seeks injunctive and declaratory relief requesting that I enjoin[6] INS officials from enforcing the requirement that a fingerprinting facility have a permanent, non-mobile location, specifically 8 C.F.R. § 103.2(e)(6)(xviii), and that I declare that section invalid. In response to Ms. DeBraun's complaint, the defendants have filed an answer and a "Motion to Dismiss and for Judgment on the Pleadings." *See* doc. # 10; *see also* Fed.R.Civ.P. 12(b)(6), 12(c).[7] A party must file a 12(b)(6) motion prior to filing a responsive pleading. Accordingly, because the defendants have answered the complaint,

I must treat this only as a motion for judgment on the pleadings. *See Turbe v. Government of Virgin Islands,* 938 F.2d 427, 428 (3d Cir.1991). Nonetheless, the standard for both motions is identical. *Id.* In addressing this motion, I am required to consider as true any well-pleaded factual allegations in the pleadings, I must draw any permissible inferences from those facts in the non-moving party's favor, and I may grant the defendants' motion only when the plaintiff has alleged no set of facts which, if subsequently proved, would entitle her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). However, I am not obligated to consider as true any conclusory or legal allegations asserted by the non-moving party.

## III. Discussion

■■■■ Section 706(2) of the APA provides that I may invalidate an agency action if I find it to be, among other things,

(A) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law[.]

will attempt to stop even non-INS operations occurring in her van. (*Id.* ¶¶ 41–45).

---

**3.** The regulation went into effect March 1, 1997. The original effective date was December 1, 1996, but was subsequently postponed by the INS. 61 Fed.Reg. 57,583, 57,584 (1996). The defendants agreed to allow Ms. DeBraun to continue operations until March 31, 1997.

**4.** The Administrative Procedures Act provides that any person who has suffered a legal wrong or been adversely affected by agency action or inaction may seek redress, other than money damages. 5 U.S.C. § 702 (1996). Ms. DeBraun alleges that the final regulation, if enforced against her, will essentially destroy her business as the majority of fingerprints she provides are taken in her mobile facility. (Compl. ¶ 34).

**5.** Ms. DeBraun claims various constitutional violations, that INS personnel improperly influenced the regulation process, and that the INS

**6.** Ms. DeBraun originally sought a temporary restraining order and a preliminary injunction on October 30, 1996. After discussions between the parties, the INS agreed to suspend the regulation and the motion was deemed moot. Subsequently, the INS stated that the regulation would be effective March 1, 1997. As a result, Ms. DeBraun renewed her motion for a TRO on February 27, 1997. Because the parties agreed to refrain from any further action pending the outcome of this motion, I deemed the renewed motion for a TRO moot as well.

**7.** Although the APA does not provide an independent grant of jurisdiction, I have subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

5 U.S.C. 706(2) (1996). The scope of judicial review over agency actions is narrow. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). However, before that restricted review can come into play, the agency must follow those procedures imposed on it by law.

■ Ms. DeBraun contends that the INS did not do so. She argues that the proposed rule never mentioned the word "permanent" and that consequently, "she had no reason or opportunity to address the issue of 'permanence.'" (Compl. ¶¶ 16, 21). Therefore, Ms. DeBraun asserts that the rule, at least with respect to the permanency requirement and the exclusion of mobile facilities, is invalid. The INS responds that its provision regarding suitable facilities clearly raised the issue that the INS intended to regulate the physical and structural requirements of a DFS—including permanency and excluding the mobility of the facility.

Section 553 details the procedures an agency must follow when engaging in rulemaking.[8] Specifically, § 553 requires in relevant part that

> (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include:
>
>> (1) a statement of the time, place, and nature of public rule making proceedings;
>>
>> (2) reference to the legal authority under which the rule is proposed; and

> (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
>
> (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. . . .

5 U.S.C. § 553(b)–(c) (1996).

■ The relevant standard when determining the adequacy of the notice and comment procedures provided by section 553 is that the "[a]gency notice must be sufficient to fairly apprise interested parties of the issues involved, so that they may present responsive data or argument relating thereto." S.Doc. No. 248, 79th Cong.2d Sess. 200 (1946); *see also* 5 U.S.C. § 553(b)(3) (notice must provide "either the terms or substance of the proposed rule or a description of the subjects and issues involved"). The Third Circuit has stated that "the submission of a proposed rule for comment does not of necessity bind an agency to undertake a new round of notice and comment before it adopts a rule which is different—even substantially different—from the proposed rule. . . . [T]he adequacy of the notice must be tested by determining whether it would fairly apprise interested persons of the 'subjects and issues' before the Agency." *American Iron & Steel Inst. v. EPA,* 568 F.2d 284, 293 (3d Cir.1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); *see also James v. Quinlan,* 866 F.2d 627, 631 (3d Cir.) (citing *American Iron*), *cert. denied,* 493 U.S. 870, 110 S.Ct. 197, 107 L.Ed.2d 151 (1989).[9] Ob-

---

8. The parties do not dispute that the notice and comment requirement applied to the contested regulation.

9. The Court of Appeals for the District of Columbia has stated that although the final rule need not mirror the proposed rule, the final rule must be a "logical outgrowth" of the rulemaking proceeding and the agency must have "alerted interested parties to the possibility of the agency's adopting a rule different than the one proposed." *Kooritzky v. Reich,* 17 F.3d 1509, 1513 (D.C.Cir. 1994). The latest decision by the Third Circuit on the issue of the adequacy of agency notice did

not refer to the "logical outgrowth" test. *See James v. Quinlan,* 866 F.2d 627, 631 (3d Cir.), *cert. denied,* 493 U.S. 870, 110 S.Ct. 197, 107 L.Ed.2d 151 (1989). Because I consider the Third Circuit's test more restrictive, I will consider the adequacy of the notice as it stands up against the Third Circuit's formulation. *See* I Kenneth C. Davis & Richard J. Pierce, Jr. *Administrative Law Treatise* § 7.3, at 302 (3d ed.1994) (suggesting that Third Circuit test is more demanding).

viously the final rule need not mirror exactly the proposed rule; however, proper notice must be given so that interested parties may have the opportunity to provide meaningful comments on the regulation. *See* I Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 7.3, at 301 (3d ed.1994) (commenting that process would be never-ending if each time a change was made based on a comment, the agency would have to arrange for another comment period).

In its explanatory notes to the proposed rule, the INS stated that through this regulation it was attempting to establish control over fingerprint providers in order to ensure the integrity and facilitation of immigration benefits and to relieve the strain on its own resources. 60 Fed.Reg. at 25,856. It stated that by this rulemaking, it wanted "to establish eligibility standards, responsibilities, and application procedures" for certification. *Id.* at 25,857. Examples of the contemplated methods included criminal history checks of the DFS employees, training for those certified to take fingerprints, requiring free "retakes" of any illegible fingerprints, requiring that fingerprint cards "be kept on file for by the [DFS] for at least 3 months for Service inspection," and periodical on-site review of DFS operations to determine compliance with the required procedures. *Id.* at 25,857–58. The INS also proposed that the DFS "be required to maintain clean and suitable facilities that are accessible to the general public." *Id.* at 25,862.

In addition, the proposed rule stated that all DFS employees would have to provide an attestation card which stated that they had checked the identity of the fingerprinted person and entered relevant identification information on the card, and that they were employed by a certified DFS. *Id.* at 25,861–62. This attestation would have to provide the name, address, and certification number of the DFS. *Id.* Also, the proposed rule stated that each INS office would keep a list of

certified DFSs in its jurisdiction, giving names, addresses, and telephone numbers. *Id.* at 25,863. The INS argues that the proposed need for on-site inspections and the need to have records on file for three months should have alerted interested parties to the possibility that facility permanence would be required.

However, in the explanatory section to the proposed rule, the INS stated its belief that approximately 3,000 outside entities provided fingerprinting services for immigrants and that these providers were primarily small businesses. *Id.* at 25,859. Accordingly, the INS stated that it "developed and reviewed this proposed rule with the needs and circumstances of small businesses specifically in mind." *Id.* Further, the INS stated that it "sought to avoid burdens on outside entities beyond those requirements needed to improve the quality of the fingerprints taken and to provide assurance to the Service that the fingerprints it receives are genuine." *Id.* In addition, when the notice stated that the agency would keep a list of certified providers with addresses and telephone numbers, it stated that telephone numbers would be provided, "if available." *Id.* at 25,863.

Here, although the INS provided notice of the *subject* involved—regulation of the fingerprinting process, including the monitoring of both the individuals who are taking the fingerprints as well as the facilities where the fingerprints are being taken—it did not fairly apprise interested parties that it also intended to address other material *issues*—those of the permanency and physical structure of the provider's fingerprinting location.[10] Although the proposed rule put interested parties on notice that the INS wanted to ensure that a provider's facilities would be conducive and suitable to the goals of the regulation, it did not put those parties on notice that it intended to require that the fingerprints be taken (either on a part-time or full-time basis) at a permanent, non-mobile location.[11]

**10.** In so finding, I am not imposing additional procedural requirements upon the INS. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978). Rather, I have determined that the INS did not

satisfy those procedures that the APA places upon it.

**11.** In its explanation of the final rule, the INS stated that it would make allowances for those instances where fingerprinting may have to take place off-site from the provider's permanent ad-

Indeed, all the INS goals could be satisfactorily furthered at either a permanent or a mobile location.

The notice as it related to the physical characteristics of the facilities themselves was general and vague; in fact the emphasis in the regulation appeared to be on the actual DFS personnel and the quality of the fingerprints. In contrast, the permanency and structural requirements of the provider's location in the final rule are particular, material, and of potentially wide-reaching effect on small businesses. *See Omnipoint Corp. v. FCC*, 78 F.3d 620, 631 (D.C.Cir.1996) (new comment period necessary when changes "are so major that the original notice did not adequately frame the subjects for discussion") (internal quotations omitted). Unlike the other requirements, there is no room for compromise—a location is either permanent and non-mobile or it is not.[12] Further, permanency and facility structure are not difficult or highly technical concepts; if the INS had originally intended to require that the facilities be permanent and non-mobile, it could have easily said so or provided some indication in the proposed rule that those were issues. Moreover, the INS had expressed both its desire not to cause major upheaval to the existing fingerprinting scheme as long as the quality and integrity of the fingerprinting was preserved and its intention to keep the concerns of small shops in mind.[13] In my view, a small-business owner, with a mobile facility, who could meet all the specific personnel and record-keeping requirements articulated by the INS could have reasonably concluded that the lack of structural permanency of his or her business

was not an issue. Accordingly, I find that "the divergence between the proposed [rule] and the final [rule] was so great that parties affected by the [permanency and structural requirements] had no way of knowing that the [INS] was considering ... [those] critical elements." *Administrative Law Treatise* § 7.3, at 300.

The situation before me contrasts sharply with that before the Third Circuit in *James* where the regulation involved the Inmate Financial Responsibility Program. 866 F.2d at 631. There, the proposed regulation stated that, in his discretion, the assistant director would set the minimal portion of a prisoner's wages to be allotted to his or her financial plan. *Id.* The final rule stated that fifty percent was the expected contribution. *Id.* Addressing the prisoners' argument that the proposed rule failed to provide adequate notice with respect to a fifty-percent allotment, the Third Circuit held that the prisoners were fairly apprised that an allotment amount was of issue and accordingly they had fair notice. *Id.* Here, however, there was no indication that the INS intended to require that the facilities be permanent thereby excluding movable facilities. "Interested parties cannot be expected to divine the [agency's] unspoken thoughts." *Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C.Cir.1991). Had the INS provided adequate and meaningful notice, interested parties, including Ms. DeBraun, could have objected to the permanency and structural requirements or presented alternatives which, after considering, the INS could have accepted or rejected.[14] Finally, because I have concluded that

dress and said that advance approval by the INS over this temporary situation would be necessary. 61 Fed.Reg. at 28,007.

12. This is unlike the proposed rule's requirement that no DFS employee may have a criminal history, yet which removes that requirement if the employer can establish that good cause exists to show that the employee is now reliable. 60 Fed.Reg. at 25,861.

13. In her opposition to the INS' motion, Ms. DeBraun contends that the final rule had the effect of eliminating existing businesses, and that this "elimination" was never mentioned in the proposed rule. I believe that Ms. DeBraun misses the mark with this argument. The effect of

any regulation which imposes requirements, where none had existed before, necessarily results in the elimination of those businesses who do not meet the new requirements. The real issue was that she did not receive proper notice of the permanency and non-mobile requirements.

14. Because this matter is before me on a motion for judgment on the pleadings, I was not provided the administrative record for review. Consequently, other than what is mentioned in the Federal Register, I am unaware of any relevant comments. Examining the comments received after the proposed rule was published may be helpful in determining the adequacy of the notice; however, such examination is not necessary in order to conduct meaningful judicial review of

the INS did not follow the required procedures when promulgating its new regulation, I will not have to consider Ms. DeBraun's substantive challenges to it.[15]

#### IV. Conclusion

For the reasons stated above, I find that the INS' notice was inadequate, and consequently, it failed to provide interested parties an opportunity for meaningful comment. Accordingly, I am invalidating the permanency requirement and corresponding exclusion of mobile facilities in section 103.2(e)(6)(xviii), and remanding that section to the INS so that it can provide for additional rulemaking proceedings consistent with this opinion.[16]

An appropriate order follows.

#### ORDER

AND NOW, this 28th day of March, 1997, it is hereby ORDERED that:

1. Defendants' Motion to Dismiss and for Judgment on the Pleadings is DENIED.

2. Plaintiff's Motion for Judgment on the pleadings with respect to the adequacy of the notice and comment procedures used by the Defendants is GRANTED.

3. 8 C.F.R. § 103.2(e)(6)(xviii) insofar as it requires that fingerprinting services be permanent and excludes full-time operation from mobile facilities is VOID.

4. This matter is REMANDED to the Immigration and Naturalization Service for such further action it deems necessary consistent with my accompanying opinion.

the agency's procedures. *See Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C.Cir.1991) ("[An agency] must itself provide notice of a regulatory proposal. Having failed to do so, it cannot bootstrap notice from a comment.") (internal quotations omitted). Although approximately forty-four groups or individuals commented on the proposed rule, the INS' explanatory comments to the final regulation do not reveal that any party commented about or inquired whether the DFS would be required to take the fingerprints from permanent locations. It may be of significance if the comments did not discuss the issue of permanency or whether the regulation excluded temporary or non-fixed locations. *See Wagner Elec. Corp. v. Volpe*, 466 F.2d 1013, 1019–20 (3d Cir. 1972) ("The absence of comment . . . may well be because the notice of proposed rulemaking never advised of this subject or issue."), *cf. Bessemer & Lake Erie R.R. Co. v. ICC*, 691 F.2d 1104, 1111 (3d Cir.1982) ("That no more explicit notice was required is confirmed by an examination of the detailed comments actually received."). Further, the fact that one party may have appreciated the possibility of these issues does not necessarily equate to a finding that the notice was sufficient for all interested parties. *See Wagner Elec.*, 466 F.2d at 1019 (finding irrelevant fact that, on basis of inadequate notice, knowledgeable parties commented on substance of final rule because others not so knowledgeable may not have commented).

15. Indeed, given the current posture of this case, and because I was not provided the record upon which the INS relied in its rulemaking, I would be unable, at this time, to determine whether the rule was arbitrary and capricious. Judicial review over non-frivolous substantive challenges without the benefit of the agency record would be meaningless. *See C.K. v. New Jersey Dep't of Health & Human Servs.*, 92 F.3d 171, 181 (3d Cir.1996) (stating that to determine whether agency action was arbitrary and capricious, court must, *inter alia*, "confine its review to the full administrative record that was before the Secretary at the time he made his decision") (internal quotations omitted).

16. Upon remand, the INS, if it so chooses, will merely have to solicit comment on the permanency and the exclusion of full-time mobile facilities issues. After receiving and considering the comments, it would seem that the INS would be free to adopt an identical provision to the one considered today. Then, possibly, the INS would be subject to Ms. DeBraun's substantive challenges. However, in order to withstand an arbitrary and capricious charge, the rule merely must be "the product of reasoned decisionmaking," be rationally related to the expressed purpose of the rule, and be supported by the evidence before the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52, 103 S.Ct. 2856, 2871, 77 L.Ed.2d 443 (1983). Furthermore, the agency's decision must be upheld even if it is of "less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 43, 103 S.Ct. at 2867. Finally, a reviewing court could not consider an action arbitrary and capricious even if more desirable alternatives existed, nor may it substitute its judgment for that of the agency. *C.K. v. New Jersey Dep't of Health & Human Servs.*, 92 F.3d at 182 (citations omitted).