

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-9-1996

# C.K. v. NJ Dept HHS

Precedential or Non-Precedential:

Docket 95-5454

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"C.K. v. NJ Dept HHS" (1996). *1996 Decisions*. Paper 86.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/86

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5454


C. K., ON HER OWN BEHALF AND AS GUARDIAN AD LITEM FOR HER
BABY S.B. AND HER DAUGHTER J.M.; L. W., ON HER OWN BEHALF
AND AS GUARDIAN AD LITEM FOR HER BABY E.W. AND HER SON J.W.;
E. P., ON HER OWN BEHALF AND AS GUARDIAN AD LITEM FOR HER
BABY I.P. AND HER SON R.P.; E. M., ON HER OWN BEHALF AND AS
GUARDIAN AD LITEM FOR HER BABY BOY B.M. AND HER DAUGHTER
C.G.; H. K., ON HER OWN BEHALF AND AS GUARDIAN AD LITEM FOR
HER BABIES T.H., D.H. AND D.H. AND OTHER SONS S.H. AND J.H.;
E. S. AND G. S., ON THEIR OWN BEHALF AND AS GUARDIAN AD LITEM
FOR THEIR BABY BOY B.S., SON C.S. AND THEIR DAUGHTER C.S.;
M. M., ON HER OWN BEHALF AND AS GUARDIAN FOR HER DAUGHTER
A.P. AND HER SON A.R., ON BEHALF OF THEMSELVES AND ALL
OTHERS SIMILARLY SITUATED,

Appellants

v.

NEW JERSEY DEPARTMENT OF HEALTH AND HUMAN SERVICES;
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPT. OF HUMAN
SERVICES IN HIS OFFICIAL CAPACITY; DONNA SHALALA, SECRETARY,
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and
THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES.


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 93-cv-05354)


Argued June 10, 1996

BEFORE:  STAPLETON, GREENBERG, and ALDISERT, Circuit Judges

(Filed: August 9, 1996)


Lawrence S. Lustberg
Jonathan Romberg
Lenora M. Lapidus
On behalf of the ACLU-NJ
Crummy, Del Deo, Dolan,
Griffinger & Vecchione
One Riverfront Plaza
Newark, NJ  07102-5497

Martha F. Davis (argued)
Deborah A. Ellis
NOW Legal Defense & Education
Fund
99 Hudson Street – 12th Floor
New York, NY  10013

Melville D. Miller, Jr.,
President
David G. Sciarra
Legal Services of New Jersey,
Inc.
101 Metroplex Drive
P.O. Box 1357
Edison, NJ  08818–1357

Attorneys for Appellants

Joseph L. Yannotti
Assistant Attorney General
Of Counsel
Dennis J. Conklin (argued)
Senior Deputy Attorney General
Michael J. Haas
Senior Deputy Attorney General
Todd A. Wigder
Deputy Attorney General

Deborah T. Poritz
Attorney General of New Jersey
Richard J. Hughes Justice
Complex
CN 112
Trenton, NJ  08625

Attorneys for Appellees New Jersey
Department of Human
Services and William Waldman,
Commissioner

John F. Daly (argued)
Mark B. Stern
Attorneys, Civil Division
Department of Justice
Faith S. Hochberg
United States Attorney
Frank W. Hunger
Assistant Attorney General
Civil Division, Room 7124
Department of Justice
Washington, DC  20530

Attorneys for Appellees

United States
Department of Health and Human Services and Donna
Shalala, Secretary

Shirley Brandman
Kathleen Sullivan
The Jerome N. Frank Legal
Services Organization
Yale Law School
127 Wall Street
New Haven, CT  06520

Lucy Williams
Northeastern University
School of Law
400 Huntington Avenue
Boston, MA

Attorneys for Amici-Curiae
Puerto Rican Legal Defense and
Education Fund, Society of
American Law Teachers, and Wider
Opportunities for Women

David A. Price
Daniel J. Popeo
Washington Legal Foundation
2009 Massachusetts Ave., N.W.
Washington, D.C.  20036

Attorneys for Amicus-Curiae
Washington Legal Foundation

Rand E. Rosenblatt
Rutgers University School of Law
Fifth & Penn Streets
Camden, NJ  08102

Attorney for Amici-Curiae
Members & Staff of the National
Commission for the Protection of
Human Subjects of Biomedical and
Behavioral Research and The
President's Commission for the
Study of Ethical Problems in
Medicine and Biomedical and
Behavioral Research

Nadine Taub
Women's Rights Litigation Clinic
15 Washington Street
Newark, NJ  07102

Judith L. Lichtman

Joan Entmacher
Susannah Baruch
Women's Legal Defense Fund
1875 Connecticut Ave., N.W.
Suite 710
Washington, D.C.  20009

Attorneys for Amici-Curiae
Women's Legal Defense Fund;
Advocates for Youth; American
Association of University Women;
Catholics for a Free Choice;
Center for Reproductive Law &
Policy; Feminist Majority
Foundation; National Abortion &
Reproductive Rights Action
League; National Council of
Jewish Women, Inc.; National
Council of Negro Women, Inc.;
National Family Planning &
Reproductive Health Association;
National Women's Law Center;
ProChoice Resource Center, Inc.;
Religious Coalition for
Reproductive Choice; Right to
Choose of New Jersey; and Union
of Needletrades, Industrial and
Textile Employees, AFL-CIO

William H. Mellor, III
Clint Bolick
Dana Berliner
Institute for Justice
1001 Pennsylvania Ave., N.W.
Suite 200 South
Washington, DC  20004-2505

Attorneys for Amici-Curiae The
American Legislative Exchange
Council; The Empowerment Network
Foundation; The Independent
Women's Forum; Bethsai Townsend;
Tomikka Simmons; and Nicole
Green

Evan A. Davis
Marcia L. Narine
Yves P. Denize
Cleary, Gottlieb, Steen &
Hamilton
One Liberty Plaza
New York, NY  10006

Attorneys for Amici-Curiae

Association for Children of New
Jersey; The National
Organization for Women (NOW-NJ);
American Friends Service
Committee; The Lutheran Office
of Governmental Ministry in New
Jersey; The National Association
of Social Workers, Inc.; The
Child Care Law Center; The Child
Welfare League of America; The
Food Research and Action Center;
and The National Association of
Child Advocates

William H. Hurd
Deputy Attorney General
David E. Anderson
Chief Deputy Attorney General
Craig M. Burshem
Assistant Attorney General
Siran S. Faulders
Senior Assistant Attorney
General
James S. Gilmore, III
Attorney General of the
Commonwealth of Virginia
900 E. Main Street
Richmond, VA  23219

Attorneys for Amici-Curiae The
Commonwealth of Virginia and The
States of Alabama, Arizona,
California, New York, South
Carolina, and Wisconsin


OPINION OF THE COURT


GREENBERG, Circuit Judge.
        Appellants, residents of New Jersey who currently
receive welfare funding through the Aid to Families with
Dependent Children ("AFDC") program, challenge the exercise by
the Secretary of Health and Human Services ("HHS") of her
authority pursuant to section 1115 of the Social Security Act, 42
U.S.C. § 1315(a) ("section 1315(a)"), which permits her to waive
requirements for state plans under the Act to enable individual
states to test reforms to their AFDC programs through
"demonstration projects."  Specifically, appellants challenge the
Secretary's grant of waivers to the State of New Jersey in July
1992 to allow implementation of the state's Family Development

Program ("FDP") which, inter alia, contains the so-called "Family Cap" provision, an amendment to existing state law that eliminates the standard increase provided by AFDC for any child born to a woman currently receiving AFDC.

Appellants claim that the Secretary's waiver was invalid and improper, that the FDP violates a number of federal statutes and regulations, and that it violates their constitutional rights to due process and equal protection. Both the appellants and the state and federal appellees moved for summary judgment in the district court on all legal issues. The court granted summary judgment for appellees on all counts and dismissed the complaint with prejudice. C.K. v. Shalala, 883 F. Supp. 991 (D.N.J. 1995). This appeal followed.

The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343(3). We have jurisdiction under 28 U.S.C. § 1291. Our review of the matter is plenary. Helen L. v. DiDario, 46 F.3d 325, 329 (3d Cir. 1995); Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991).

## I.  FACTUAL BACKGROUND
### A.  STATUTORY BACKGROUND

AFDC is a joint federal and state program established under Title IV-A of the Social Security Act, 42 U.S.C. § 601 et seq., to "enabl[e] each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living . . . ." 42 U.S.C. § 601. Under the program, if a state submits an AFDC plan that meets the requirements of 42 U.S.C. § 602, the federal government will reimburse it for a portion of the benefits it provides to aid recipients. In other words, the state will receive federal matching funds if it implements an AFDC plan that comports fully with the Social Security Act.

AFDC is a "scheme of cooperative federalism" in which states are given "considerable latitude" in the administration of their own programs. King v. Smith, 392 U.S. 309, 316-19, 88 S.Ct. 2128, 2133-34 (1968). Within the statute itself, Congress authorized financial aid:

> [f]or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection . . . .

42 U.S.C. § 601.

In 1962, Congress added section 1115 of the Social Security Act, now 42 U.S.C. § 1315, in the Public Welfare Amendments of 1962, Pub. L. No. 87-543, 76 Stat. 192 (1962). Section 1315 provides, in relevant part:

> In the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of subchapter I, X, XIV, XVI, or XIX of this chapter, or Part A or D of subchapter IV of this chapter, in a State or States--
>
> > (1) the Secretary may waive compliance with any of the requirements of section 302, 602, 654, 1202, 1352, 1382, or 1396a of this title, as the case may be, to the extent and for the period he finds necessary to enable such State or States to carry out such project . . . .

42 U.S.C. § 1315(a).

New Jersey's AFDC program is administered by the state's Department of Human Services ("DHS"). On July 1, 1992, the New Jersey legislature enacted the Family Development Program, now known as the Family Development Act, N.J. Stat. Ann. § 44:10-19 to -33, N.J. Stat. Ann. § 44:10-3.3 to -3.8 (West 1993). The FDP aims to reduce welfare dependency by, inter alia, developing educational and vocational skills. To advance these goals, one aspect of the FDP mandates that implementing state and county agencies provide individual recipients with contracts tailored to the individuals' needs, providing the recipients with such services as:

> job development and placement in full-time permanent jobs . . . counseling and vocational assessment; intensive remedial education, including instruction in English-as-a-second language; financial and other assistance for higher education . . .; job search assistance; community work experience; employment skills training focused on a specific job; and on-the-job training in an employment setting.

N.J. Stat. Ann. § 44:10-25(b). The job training and education programs created by the FDP for New Jersey's AFDC recipients ("FDP-JOBS") are intended to serve as New Jersey's education, employment and job training programs under 42 U.S.C. § 681. See N.J. Stat. Ann. § 44:10-19 note.

To assist recipients in pursuing their educational and vocational goals, the FDP provides specific benefits, such as financial assistance for higher education (N.J. Stat. Ann. § 44:10-25(f)), day care services (N.J. Stat. Ann. § 44:10-25(g)(1)), transportation services (N.J. Stat. Ann. § 44:10-25(g)(2)), and the extension of Medicaid benefits for up to two

years for persons who "graduate" from the AFDC program as a result of increased earned income (N.J. Stat. Ann. § 44:10-25(g)(3)).

The provision challenged in this action is section 3.5 of the chapter, an amendment to then-existing state law that eliminates the standard AFDC grant increase (e.g., $102 for a second child and $64 for a third child) for any child conceived by and born to an AFDC recipient. In legislative findings and declarations accompanying the enactment of section 3.5, the New Jersey legislature declared that:

> [t]he welfare system in this State should be designed to promote family stability among AFDC recipients by eliminating the incentive to break up families created by AFDC program regulations, which undermines the ability of AFDC-enrolled mothers to achieve economic self-sufficiency and thereby perpetuates their dependence, and that of their children, on welfare.

N.J. Stat. Ann. § 44:10-3.7(c).

Briefly stated, after an initial ten-month grace period to provide notice to affected recipients, the FDP denies additional benefits to families receiving AFDC upon the birth of an additional child conceived while the family was receiving AFDC, N.J. Admin. Code tit. 10, § 82-1.11 (1996). A family affected by the provision is entitled to retain a larger amount of earned income, permitting the family not only to offset the denial of additional benefits but to realize an overall increase in financial benefits through earnings. See N.J. Stat. Ann. § 44:10-3.5 and -3.6.

Section 3.5 directly conflicts with existing federal law. Even though the FDP was enacted as a permanent, statewide change to New Jersey's AFDC program, its implementation could not occur without the state losing its federal matching funds, absent a waiver from the Secretary of HHS. Consequently, following the bills' passage, the New Jersey Commissioner of Human Services applied to HHS pursuant to 42 U.S.C. § 1315(a) for waivers of the conflicting provisions of the federal act.

## B. THE ADMINISTRATIVE RECORD

The administrative record submitted by the federal appellees is important for resolution of the legal issues involved in the case. Therefore, we will present the contents of the record in some detail, as did the district court.

In mid-May 1992, HHS Assistant Secretary for Children and Families Jo Anne B. Barnhart met with a coalition of welfare advocacy groups to receive their commentary on and objections to New Jersey's proposed waiver application. App. at 41, 43. Following this meeting, on May 19, 1992, Melville D. Miller, President of Legal Services of New Jersey, Inc., submitted on behalf of his organization and 12 other advocacy groups a memorandum to Assistant Secretary Barnhart that detailed certain preliminary objections to New Jersey's AFDC waiver request. App. at 43-68.

On June 5, 1992, DHS submitted its formal application to HHS for a waiver under section 1315(a) that would authorize, inter alia, the state's implementation of section 3.5 as well as the FDP-JOBS program as a five-year experimental project. App. at 174. The application included a proposal by the agency that described counterproductive results of current welfare policies and described how New Jersey's FDP would address these deficiencies with the goal of ultimately breaking the "cycle of poverty." App. at 175-288. While DHS conceded that depriving children of AFDC benefits might seem "harsh," it nevertheless justified section 3.5 by stating that its purpose was to encourage parents to be responsible in their decision to have additional children while receiving welfare. App. at 183-85. Indeed, DHS explicitly described the choice to have a child while receiving public support as "irresponsible [and] not socially desirable." App. at 183. DHS stated that it would offer financial incentives to encourage AFDC parents with children born after section 3.5 became effective to offset the benefits they otherwise would have received through priority for employment and training services in FDP-JOBS and through the increase in the earned income disregard. App. at 184-85.

On July 2, 1992, Assistant Secretary Barnhart submitted a memorandum to then-Secretary Louis Sullivan that formally recommended approval of New Jersey's waiver request. App. at 40. Shortly thereafter, on July 9, 1992, the aforementioned advocacy groups sent a letter to Assistant Secretary Barnhart to supplement their earlier submission, predicated upon their "review of the final application submitted by the State, together with [their] review of the implementing regulations for the FDP as published in the New Jersey Register . . . ." App. at 36. In a reply letter dated August 7, 1992, Assistant Secretary Barnhart informed Legal Services of New Jersey that HHS had considered their supplemental objections but that the waiver still was granted, in part because the New Jersey program "represented a new and innovative approach aimed at promoting self-sufficiency and reducing long-term welfare dependency." App. at 17.

On July 20, 1992, Secretary Sullivan approved the waiver to allow the entire FDP to be implemented as a five-year project under section 1315(a). App. at 18-35. The waiver allowed DHS to implement section 3.5 statewide commencing on October 1, 1992. App. at 20-21. Included among the terms and conditions of the waiver was the requirement that New Jersey conduct a demonstration project whereby families subject to the provisions of the FDP would be "randomly assigned to either a treatment group whose eligibility will be determined based on FDP provisions, or to a nontreatment (or control) group for whom eligibility will be determined based on existing program provisions." App. at 21. DHS was permitted to phase in FDP-JOBS, first in Essex, Hudson, and Camden counties, and then in the remaining 18 counties of the state according to a DHS-sponsored schedule, but "by no later than June 1995." App. at 22. DHS adopted regulations to implement the FDP on September 21, 1992. 24 N.J. Reg. 3352 (Sept. 21, 1992). The regulations became operative on October 1, 1992, and provide that every child

born after August 1, 1993, to a parent receiving AFDC for any month within the ten months preceding the birth of the child "shall be excluded from the eligible unit" and the parent "shall not be entitled to incrementally increased AFDC benefits as a result of the birth of a child(ren)." N.J. Admin. Code tit. 10, § 82-1.11(a). The only exception to section 3.5's mandate is for the children of new AFDC applicants that are born within ten months of their families' application for benefits. N.J. Admin. Code tit. 10, § 82-1.11(a)(2).

## II. VALIDITY OF THE HHS WAIVER UNDER THE APA

Appellants first challenge the district court's decision to uphold the Secretary's grant of the waiver to New Jersey under 42 U.S.C. § 1315(a). Appellants claim that the Secretary's decision to grant the waiver violated the Administrative Procedure Act ("APA") in two ways. First, they claim that the Secretary failed to articulate or explain in the record how her decision complied with the statutory requirements of 42 U.S.C. § 1315(a) and how it addressed the other statutory and constitutional issues raised during the administrative process. Second, the appellants claim that the Secretary exceeded her authority under section 1315(a) by granting a waiver that is not likely to assist in promoting the objectives of AFDC, is imposed beyond the extent necessary to carry out the project, and is not a valid experimental project.

We note at the outset that a court, in reviewing informal agency action, "is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824 (1971). Nor will we presume even to comment upon the wisdom of New Jersey's effort at welfare reform. Although our inquiry into the propriety of the Secretary's waiver here "is to be searching and careful, the ultimate standard of review is a narrow one." Id. Because we believe that this narrow standard of review forbids us to disturb the Secretary's decision, we will explain the standard of review in some detail.

The Supreme Court in Overton Park explained the contours of judicial review of informal agency action under the APA. At issue in that case was the Secretary of Transportation's approval of plans to construct a federally-funded interstate highway through a city park located near the center of Memphis, Tennessee. Two statutes prohibited the Secretary from authorizing the use of federal funds to finance the construction of highways through public parks absent findings that no "feasible and prudent" alternative route existed and that there has been "all possible planning to minimize harm" to the park. 401 U.S. at 405, 91 S.Ct. at 818 (quoting the Department of Transportation Act of 1966, as amended, 49 U.S.C. § 1653(f), and the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138). The Court noted that these statutory provisions were "clear and specific directives" to the Secretary, operating as "plain and explicit bar[s] to the use of federal funds for construction of highways through parks--only the most unusual situations are exempted." Id. at 411, 91 S.Ct. at 821. "Despite the clarity of the

statutory language," id., the Secretary announced his approval of the highway project without providing any statement of factual findings: "He did not indicate why he believed there were no feasible and prudent alternative routes or why design changes could not be made to reduce the harm to the park." Id. at 408, 91 S.Ct. at 819.

The Court held that such formal findings were not required. "Undoubtedly, review of the Secretary's action is hampered by his failure to make such findings, but the absence of formal findings does not necessarily require that the case be remanded to the Secretary." Id. at 417, 91 S.Ct. at 824. The Court noted that "the Secretary's decision is entitled to a presumption of regularity," but cautioned that the APA nonetheless "require[s] the reviewing court to engage in a substantial inquiry." Overton Park, 401 U.S. at 415, 91 S.Ct. at 823.

The parties do not challenge the district court's determination that here, as in Overton Park, this "substantial inquiry" is pursuant to APA "arbitrary or capricious" review: "[A]gency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' . . . ." Id. at 414, 91 S.Ct. at 822 (quoting 5 U.S.C. § 706(2)(A)). The APA thus requires a finding that the actual choice made was neither arbitrary nor capricious. To make this finding, the court must confine its review to "the full administrative record that was before the Secretary at the time he made his decision," and "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. at 420, 416, 91 S.Ct. at 825, 824.

The Supreme Court, subsequent to Overton Park, has made it clear that we must remand to the agency "[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it." Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607 (1985); see also Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654, 110 S.Ct. 2668, 2680 (1990). "We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867 (1983) (internal quotation marks omitted).

The Court's jurisprudence in this area indicates that the terms of the enabling statute frame judicial review of informal agency action by (1) establishing the scope of the agency's authority, and (2) indicating what relevant factors the agency must consider in making its decision. In this case, the Secretary is authorized to waive compliance with certain provisions of the Social Security Act "to the extent and for the period he [or she] finds necessary" to enable a state to carry out an AFDC demonstration project if, "in the judgment of the Secretary, [the project] is likely to assist in promoting the objectives" of the AFDC program. 42 U.S.C. § 1315(a).

Although here, as in Overton Park, there is "law to apply," 401 U.S. at 413, 91 S.Ct. at 822, these statutory requirements demand of the administrator far less than those at issue in Overton Park. Whereas the administrator in Overton Park was prohibited from authorizing the construction of the highway through the park without first finding that no "feasible and prudent" alternative route existed and that there had been "all possible planning to minimize harm" to the park, id. at 405, 91 S.Ct. at 818, the Secretary here was authorized to grant a waiver of compliance if she judged that the experiment was "likely to assist in promoting the objectives" of the AFDC program. 42 U.S.C. § 1315(a). As Chief Judge Friendly observed, writing for a panel of the Court of Appeals for the Second Circuit in a case involving challenges to a section 1315(a) waiver:

> [C]onsideration of these claims, like those in [Overton Park], takes us into a type of judicial review considerably more difficult to define and exercise than traditional review of administrative action. We have here no adversary hearing, no record, no statement of the grounds for the Secretary's action, except as these may be inferred from the papers on which he acted . . . . While we shall follow the guidelines helpfully stated in Overton, so far as applicable, we find . . . merit . . . in the defendants' position that, purely legal issues apart, it is legitimate for an administrator to set a lower threshold for persuasion when he is asked to approve a program that is avowedly experimental and has a fixed termination date than a proposal, like that in Overton Park, which is irreversible. Moreover, Overton Park dealt with a situation where an administrator was required to make two highly specific determinations on the basis of explicit, legislatively prescribed considerations, rather than reach an over-all `judgment'. In saying this we are not insensitive to the impact these projects may have on the lives of thousands of people, many of whom are in `brutal need[.]'

Aguayo v. Richardson, 473 F.2d 1090, 1103 (2d Cir. 1973) (citations and footnotes omitted), cert. denied, 414 U.S. 1146, 94 S.Ct. 900 (1974).

The court in Aguayo stated that "the only limitation imposed on the Secretary was that he must judge the project to be 'likely to assist in promoting the objectives'" of AFDC, and so the central question before the court was "whether the Secretary had a rational basis" for making that determination. Id. at 1105 (quoting 42 U.S.C. § 1315(a)). Rejecting the contention that the administrative record was inadequate concerning many details of the challenged program, the court found that:

> the material furnished by the State in
> justifying the programs and applying for
> approval adequately covered the policy,
> budgetary and logistical essentials, and the
> statute--speaking in terms of an otherwise
> unfettered `judgment'--does not require that,
> before the Secretary approves an experiment,
> every i must be dotted and every t crossed.

Id. at 1107. The court concluded: "We are satisfied that the materials before the Secretary sufficed for 'a consideration of the relevant factors' by him and that there was no 'clear error of judgment' on his part." Id. at 1106 (quoting Overton Park, 401 U.S. at 416, 91 S.Ct. at 824).

We find Aguayo persuasive, and agree generally with that court's statement of the proper standard of review of section 1315(a) waivers under the APA. To resolve the appellants' APA challenges, the central question before us is whether the record disclosed that the Secretary rationally could have determined that (1) New Jersey's program was "likely to assist in promoting the objectives" of AFDC, and (2) it was necessary to waive compliance to the extent and for the period she did to enable New Jersey to carry out its experiment. See 42 U.S.C. § 1315(a). If our review of the record satisfies us "that the materials before the Secretary sufficed for a consideration of the relevant factors by [her] and that there was no clear error of judgment on [her] part," then we may not disturb the Secretary's decision. Aguayo, 473 F.2d at 1106 (internal quotation marks omitted).

Turning to the appellants' specific APA challenges here, the first contention is that the Secretary failed to articulate or explain her reasoning in granting the waiver over the objections of representatives of the appellants during the administrative process. As explained above, however, the mere absence of formal findings is not a sufficient basis for reversal because the Secretary was not required under the APA or section 1315(a) to make findings or to explain her decision to grant New Jersey's waiver request. See Overton Park, 401 U.S. at 409, 417, 91 S.Ct. at 820, 824; see also Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. at 654, 110 S.Ct. 2680 (suggesting that the APA, by directing a court to ensure that agency action is not arbitrary or capricious, functionally requires an agency to "take whatever steps it needs" to create a record sufficient to "enable the court to evaluate the agency's rationale at the time of decision"). Our review is limited to considering whether the Secretary's decision to grant the waiver was arbitrary or capricious, and we will reverse only "[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if [we] simply cannot evaluate the challenged agency action on the basis of the record before [us]." Florida Power & Light Co., 470 U.S. at 744, 105 S.Ct. at 1607.

We will consider next whether the Secretary rationally could have determined that the FDP was "likely to assist in

promoting the objectives" of AFDC.  As the district court correctly noted, Title IV of the Social Security Act expressly provides that the purpose of the AFDC program is to "furnish financial assistance . . . to needy dependent children and [their] parents or relatives . . . to help maintain and strengthen family life . . . ."  42 U.S.C. § 601.  The statute identifies other objectives of the program to include the encouragement of "self-support and personal independence," and the promotion of "continuing parental care and protection" for underprivileged children.  Id.

The waiver request submitted by New Jersey delineates three primary goals of the FDP: (1) breaking the cycle of poverty; (2) enhancing the role of individual responsibility; and (3) strengthening and reuniting families.  App. at 179.  As the district court found, these aspirations, on their face, conform to the purposes of AFDC.  C.K. v. Shalala, 883 F. Supp. at 1005.  The district court relied upon the following material from the New Jersey waiver request to support its decision that section 3.5, in particular, is consistent with the objectives of AFDC:

> `[o]ne important way the FDP will encourage decision making is to offer parents a choice when they have another child while receiving welfare.  A parent will not receive an AFDC benefit increase to take into account an additional child.
>
> . . .
>
> However, [the FDP] will offer a financial incentive for these parents to work which potentially will more than offset the benefit they would have otherwise received.  This incentive will equal the current federal disregards plus the difference between the disregards and 50 percent of the monthly payment standard for financial assistance.  These cases will also receive priority for employment and training services.
>
> This may appear harsh, but it is based on the same principle that applies to everyone else in our society.  If a person is working and has a baby, that person's salary is not automatically increased.  Yet, that is essentially what we are required to do under [current] federal AFDC regulations.  We believe that if a person is given a choice, that person will do what is best for the family which, in this case, is work.  We can best help others by empowering them to help themselves.  The children will continue to be eligible for Medicaid and increased food stamps.'

Id.; see also app. at 184-85.

The district court found that the above statement regarding the benefits ceiling imposed upon AFDC recipients, along with the provision for the maintenance of Medicaid and food stamps benefits for the children, "clearly evince that the state's goals are congruous with § 601's stated purpose of enabling `parents [or] relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection.'" C.K. v. Shalala, 883 F. Supp. at 1005 (quoting 42 U.S.C. § 601). The court further stated that it was patent from its examination of the documents generated by HHS that the Secretary had reviewed the state's submission regarding section 3.5 and had judged it likely to promote at the very least the AFDC objective of parental self-sufficiency and autonomy. Id. The court noted specifically that the terms and conditions appended to the Secretary's waiver included provisions for evaluation of the FDP to measure if and to what extent section 3.5 aids AFDC recipients in "slaying their own personal welfare dragon." Id. at 1005-06. The court held that "the Secretary's judgment that the state's FDP is consistent with the objectives of AFDC was predicated on a consideration of the relevant factors and was not arbitrary or capricious." Id. at 1006.

We agree with the district court's decision. It seems to us that the stated purposes of the New Jersey program are likely to pursue the goals, in the aggregate, of AFDC. The appellants, however, claim that the record as it presently exists does not enable us to determine whether the Secretary considered the broad range of issues surrounding the project. We agree with the district court, however, that the record is satisfactory insofar as it would allow the Secretary to ascertain whether the program pursues the goals of AFDC.

In reaching this decision, we agree with the district court's analysis of prior cases on this issue. Appellants attack the Secretary's decision for failing to address the specific objections raised by welfare advocacy groups during the administrative review process. They argue that we should remand the action to the Secretary for additional consideration of those objections in light of Beno v. Shalala, 30 F.3d 1057 (9th Cir. 1994), which found remand appropriate after determining that the record contained essentially no evidence to indicate that the Secretary ever took note of the plaintiffs' opposition, but for one "conclusory" letter to their counsel. Id. at 1074. However, we, like the district court, decline to find in Beno v. Shalala a rule that in all cases an administrative record is deficient and must be supplemented where it does not contain a specific recitation and refutation of objections submitted in opposition to a proposed section 1315(a) waiver. See C.K. v. Shalala, 883 F. Supp. at 1006. Here, the record reflects that HHS officials had at least one meeting with the welfare advocacy groups to address their concerns about the waiver request. App. at 43. The record also contains lengthy objections by the groups in opposition to the proposed waiver, in addition to many letters submitted by the general public, mostly in opposition to New Jersey's reform proposal.

We agree with the district court that, given the fact that prior to making her decision to grant the waiver the Secretary had before her extensive materials as to the purported harms the FDP might cause, precedent allows us to give the Secretary the benefit of the doubt and conclude that she did consider those objections in approving the waiver. C.K. v. Shalala, 883 F. Supp. at 1007-08. In this case, as in Aguayo, the Secretary had sufficient data, including information and arguments addressing all the pertinent issues, to consider the factors relevant to her decision. Aguayo, 473 F.2d at 1106. We will not assume that the Secretary ignored the materials presented in contravention of the state's position simply because, in the end, she was not persuaded by them. Thus, we believe that the record as it stands is satisfactory insofar as it would allow the Secretary to ascertain whether the program pursues the goals of the AFDC, and that the Secretary did not exceed her authority under section 1315(a) in this regard.

However, the appellants also claim that the Secretary exceeded her authority under section 1315(a) by granting a waiver that was broader than necessary to carry out the project, and that is not a valid experimental project. We will address these two claims in turn. With respect to the first, the district court decided that approval of that portion of the FDP that permitted statewide application of section 3.5 while allowing a three-year phase-in for the enhanced JOBS program was within the Secretary's discretion. Further, the court decided that it was not an abuse of discretion for the Secretary to allow New Jersey to execute the provision aimed at encouraging employment and treating AFDC families throughout the state equally with the working poor. C.K. v. Shalala, 883 F. Supp. at 1008. The court therefore found that the Secretary's approval of waivers for New Jersey's FDP was not arbitrary and capricious and that there had been no violation of the APA. Id.

In support of their claim that the scope of the waiver was unreasonably broad, appellants argue first that the Secretary's waiver authorized DHS to impose section 3.5 on every AFDC family across the state, except for 3,000 families randomly selected for a control group. The waiver directed DHS to gather data to study section 3.5's effects on these 3,000 families and the 6,000 families placed into an experimental group. Thus, appellants argue, HHS allowed the imposition of section 3.5 on virtually the entire statewide AFDC population of 143,000 families, even though it did not require any research data from 134,000 of them -- a waiver they claim was beyond the extent necessary to carry out the project.

Next, appellants argue that HHS failed to limit section 3.5's applicability to the extent necessary for its implementation by approving it without any exceptions. They note that the section makes no exceptions for those who become pregnant through rape, incest or failed contraception, or for those who decide against abortion for religious, ethical, or medical reasons. Further, in their argument for terming section 3.5 a "Child Exclusion," appellants claim that the section completely bars eligible children from receipt of AFDC:

> [U]nder a family maximum, when the oldest child in a large family becomes too old to receive AFDC, the family continues to receive the same level of benefits because the younger children's grants have not been totally rescinded. Under the Child Exclusion, however, when the oldest child becomes too old to receive AFDC, those benefits disappear; the excluded children never receive benefits because their eligibility has been completely eliminated. Similarly, under the family maximum, if a child in a large family is sent to live with a relative, the child can receive AFDC benefits because the child's eligibility was never rescinded. Dandridge [v. Williams], 397 U.S. 471, 480, 90 S.Ct. 1153, 1159 (1970). Under the Child Exclusion an excluded child cannot receive benefits no matter where he or she lives.

Br. at 34.

The federal appellees argue that the broad language of section 1315(a) allows both the states and the Secretary wide discretion to conduct a variety of experiments and demonstration projects. Br. at 24. Thus, they claim that:

> Although the Secretary certainly has the authority to place limits on a proposed waiver project, and could conceivably abuse her discretion by approving a project of truly excessive scope or duration, plaintiffs lose sight of the proposition that neither the states nor the Secretary may be held to `standards of scientific precision' in the design and scope of such projects.

Br. at 24 (citation omitted). With regard to section 3.5's applicability state-wide, the federal appellees claim that "the Secretary's broad § 1315 waiver authority by no means excludes the possibility of a `demonstration' conducted on a state-wide basis." Id. at 25. Regarding the appellants' claim that the waiver was excessively broad "simply because the Secretary did not impose exceptions to the plan's provisions that the State itself had not called for," br. at 26, the federal appellees state that:

> This argument loses sight of the basic fact that this was a demonstration project, geared to assessing the efficacy of new approaches to welfare issues. While it may be that some exceptions of the sort plaintiffs suggest might eventually prove to be useful refinements of the approach tested here, the Secretary acted well within her discretion under § 1315 in approving this pilot program, as an initial test of these approaches,

without such exceptions.
Id. at 26.

We are well aware of our proper deference to the Secretary with regard to the issuance of section 1315 waivers. However, that deference is not absolute. We also have a duty to examine her actions to determine whether they were arbitrary or capricious within the meaning of the APA, 5 U.S.C. § 706(2)(A), and to examine whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, 103 S.Ct. at 2867.

An amicus group has brought it to our attention that, in reviewing subsequent waiver requests for provisions similar to New Jersey's section 3.5, HHS has required that states include exceptions that are absent from New Jersey's law. See br. of Puerto Rican Legal Defense and Education Fund, et al. at 30-31 n.25. The amici claim that on October 12, 1995, Howard Rolston, Director of the Office of Planning, Research and Evaluation of HHS, wrote in response to Connecticut's waiver request:

> Further, exceptions to the application of the benefit cap have been required: when the additional child was conceived as a result of incest or sexual assault; for a child who does not reside with his or her parent; and for a child that was conceived in a month the family was not receiving AFDC or during some limited set period following receipt.

Id.

Thus, it seems that the Secretary has required exceptions to provisions similar to New Jersey's section 3.5 in subsequent waivers under section 1315. We, however, recognize that the Secretary, in her discretion, is allowed to change her mind over time regarding the wisdom of certain programs. Indeed, experiments are supposed to demonstrate the failings or success of such programs. Our conviction that the Secretary truly considered the objections presented to her by the appellants' representatives in the summer of 1992 thus remains unshaken. Accordingly, we agree with the position of the appellees that it is within the Secretary's discretion to determine the wisdom of welfare reform programs in a piecemeal fashion. She need not have included the exceptions to the workings of New Jersey's provision that she later required of Connecticut's program and she legally is allowed to change her mind. Our inquiry is limited to whether the Secretary's actions in defining the scope of New Jersey's waiver were arbitrary or capricious. Since we cannot so conclude, we will affirm the decision of the district court that the waivers did not violate the APA.

The appellants' final APA-based argument is that section 3.5 is not a valid experimental project because it is not likely to yield useful information, and that the Secretary therefore acted arbitrarily or capriciously in authorizing it. Br. at 27. The appellants rely on Beno v. Shalala for the proposition that "the Secretary must make some judgment that the project has a research or a demonstration value" -- that is, "she must determine that the project is likely to yield useful information or demonstrate a novel approach to program administration." 30 F.3d at 1069 (noting that "[a] simple benefits cut, which might save money, . . . would not satisfy this requirement"). Noting that the record includes no express finding on this point (which, as we have explained, does not necessarily require reversal), the appellants further assert that the Secretary reasonably could not have made the requisite determination with respect to section 3.5. The appellants rely on studies, cited in the record, indicating no statistically significant relationship between AFDC grant size and family size, and fault the Secretary for granting the waiver in the absence of "any evidence demonstrating a likelihood that a comparison of [section 3.5's] treatment and control groups would provided useful information showing a correlation between AFDC benefit levels and family size." Br. at 27-28.

We note first that, by its plain terms, section 1315(a) only requires the Secretary to determine that the proposed demonstration project is "likely to promote the objectives" of the AFDC. Even assuming that the Secretary was required to make the more specific determination that section 3.5 was likely to yield useful information, however, we believe the record in this case would support such a determination. Contrary to the appellants' assertions, the stated purpose of section 3.5 was not merely to lower fertility rates, but also:

> to encourage families who have additional
> children while on AFDC to take advantage of
> the additional earned income disregard by
> seeking employment to help cover the child's
> financial needs. It attempts to break the
> cycle of welfare dependency as the only means
> of acquiring financial resources.

App. at 221. The Secretary found that the goals of FDP included "break[ing] the cycle of poverty, [and] enhanc[ing] the role of individual responsibility." App. at 40. In her August 7, 1992 letter to a representative of the appellants during review of the waiver proposal, Assistant Secretary Barnhart explained that:

> the Department approved New Jersey's waiver
> application . . . because it represented a
> new and innovative approach aimed at
> promoting self-sufficiency and reducing long-
> term welfare dependency. We will be able to
> determine whether the project meets its goals
> through the rigorous evaluation that is
> required as part of the application's
> approval.

App. at 17. The "rigorous evaluation" mandated by the Secretary

requires New Jersey to evaluate the effects of the FDP not only on family structure -- including birth rates -- but also to evaluate whether "the FDP help[s] AFDC recipients to achieve self-sufficiency" and how "the FDP impact[s] AFDC, Food Stamp, and Medicaid participation and costs." App. at 27 (listing specific outcome measures).

Thus, it is clear that the Secretary expected the FDP, including section 3.5, to yield useful information to enable her "to determine whether the project meets its goals." App. at 17. We cannot say that this expectation, based on the record before the Secretary at the time of her decision, was unreasonable. Accordingly, even assuming that, prior to granting a section 1315(a) waiver, the Secretary must "determine that the project is likely to yield useful information or demonstrate a novel approach to program administration," Beno, 30 F.3d at 1069, we cannot conclude that her decision to grant New Jersey's waiver request was either arbitrary or capricious.

### III.   STATUTORY ARGUMENTS
#### A.   THE HUMAN SUBJECTS PROTECTIONS OF 42 U.S.C. § 3515b

42 U.S.C. § 3515b contains safeguards for human subjects involved in research projects or experiments conducted with funds appropriated to HHS. The statute provides in relevant part that no HHS appropriated funds:

> shall be used to pay for any research program or project or any program, project, or course which is of an experimental nature, or any other activity involving human participants, which is determined by the Secretary or a court of competent jurisdiction to present a danger to the physical, mental, or emotional well-being of a participant or subject of such program, project, or course, without the written, informed consent of each participant or subject, or a participant's parents or legal guardian, if such participant or subject is under eighteen years of age. The Secretary shall adopt appropriate regulations respecting this section.

42 U.S.C. § 3515b. The appellants contend, as they did in the district court, that section 3.5 presents a real and immediate danger to themselves and their dependent children because of the ceiling that it places on the AFDC funds that they receive. They argue that the Secretary approved section 3.5 without first determining whether it presented a danger to the recipients and their dependents and, consequently, whether the program first required the informed consent of each recipient.

As the district court noted, the Secretary's position is that HHS's present human subject regulations generally exempt welfare experiments from review by an Institutional Review Board ("IRB"). C.K. v. Shalala, 883 F. Supp. at 1009. These regulations, located at 45 C.F.R. Part 46, require that HHS research on human subjects must include (1) prior review of the project by an IRB, 45 C.F.R. §§ 46.107-.115 (1995), and (2)

informed consent, 45 C.F.R. §§ 46.116–.124. Section 46.101(b)(5)(i) specifically excludes from these safeguards research and demonstration projects designed for "public benefit or service programs," "procedures for obtaining benefits or services under those programs," and "possible changes in methods or levels of payment for benefits or services under those programs." 45 C.F.R. § 46.101(b)(5)(i). Thus, the regulations provide that, as a general rule, a project that changes or alters the amount of benefits received will not present a danger such that the informed consent requirement is triggered, but they do not foreclose a finding of danger in a specific situation.

The Secretary argues that a waiver under 42 U.S.C. § 1315 by its terms contemplates an estimation in advance of the danger(s) posed by a particular experimental project. Comments published with HHS regulations promulgated in 1983 justify the general exemption for social welfare research as undertakings "fundamentally different" from the experiments otherwise within the ambit of the statute. 48 Fed. Reg. 9266 (1983). Moreover, the Secretary asserts that the comments express the notion that benefits programs already are subjected to substantial state and federal review such that requiring an "additional layer of review for such projects [would be] duplicative and needlessly burdensome in light of the substantial review process to which they are already subjected by state and federal officials." Id. at 9266.

It is clear to us that the Secretary's judgment that AFDC demonstration projects involving changes in benefit levels need no additional review represents a reasonable construction of a regulatory statute adopted by the agency charged with enforcement of that statute. New Jersey's change in how it allocates AFDC benefits is exactly the kind of "changes in . . . levels of payment" addressed by the general exemption from IRB review under 45 C.F.R. § 46.101(b)(5)(i). However, we disagree with the district court's particular reasoning for holding that the Secretary complied with the human subjects research statute. That court found that "it is clear that [section 3.5] falls within that category of social programs insulated from additional review such that the Secretary's failure to comport with the dictates of § 3515b is not actionable." C.K. v. Shalala, 883 F. Supp. at 1009. We do not agree with the district court that the Secretary need not comport with the dictates of section 3515b. In contrast, we believe that the "additional layer of review" from which HHS exempted public benefits experiments was the regulatory requirement of IRB review, not the statutory requirement of review for danger. We do believe, however, that in the case of waivers under section 1315, the Secretary intended that her review for danger be subsumed within her more general review of the programs at issue. As we are satisfied that the issue was presented to the Secretary by the appellants' representatives in their objections to New Jersey's plan, and are satisfied that the Secretary considered the issue in her review of the waiver, we will affirm the judgment of the district court on this point.

Appellants also have argued that section 3.5 constitutes experimentation involving pregnant women and fetuses

in contravention of HHS regulations that set forth additional protections for research, development, and other activities involving pregnant women, fetuses, or in vitro fertilization. 45 C.F.R. § 46.201 et seq. The district court, however, decided that section 3.5 "has no effect on the level of benefits received by a pregnant woman; moreover, the data to be garnered from the program and evaluated by HHS/DHS does not at all implicate issues and/or concerns regarding pregnant women and/or fetuses." C.K. v. Shalala, 883 F. Supp. at 1012. The court therefore decided that section 3.5 is not directed toward, "nor will it measure," the effects on the pregnant or the unborn. Id.

Appellants argue that section 3.5 "involves" pregnant women, which would trigger IRB review and the other protections required by Part 46. They claim that the regulations indicate that pregnant women need not be the exclusive subjects of the experiment, but that experiments simply must "involve" pregnant women in order to trigger application of the regulations. Moreover, appellants are correct in noting that the 1983 regulations adopted to exempt human experimentation that involves public benefits programs from the requirements of Part 46 specifically do not apply to experimentation involving pregnant women, fetuses, or in vitro fertilization. 45 C.F.R. § 46.101(i), n.1. Thus, the exemption from IRB review discussed above does not apply to New Jersey's program if that program is decided to "involve" pregnant women or fetuses.

The question for us, then, is whether section 3.5 involves pregnant women or fetuses within the meaning of 45 C.F.R. Part 46. More specifically, we must determine whether the Secretary considered the possible application of the regulations to New Jersey's program as part of her general review under section 1315 and ruled out their applicability, or whether she failed to consider the regulations' effects at all. This question, of course, is distinct from whether statutory requirements can be waived, as it instead focuses on whether the alleged requirement is applicable in the first place.

Welfare advocacy groups did raise the possible applicability of the more general regulations applying to experimentation involving human research subjects in their objections to New Jersey's waiver application, although there is no specific reference in the administrative record to the possibility that the regulations aimed at experimentation involving pregnant women and fetuses might apply to New Jersey's program. However, both the general regulations relating to experimentation with human research subjects and the specific regulations pertaining to pregnant women and fetuses appear in 45 C.F.R. Part 46, the citation provided by the welfare advocacy groups in their objections to the waiver. App. at 60.

Again, our standard of review requires that we give the Secretary the benefit of the doubt and that we assume she was familiar with the structure of the regulations issued by her own agency, particularly in light of the fact that welfare advocacy groups provided the citation for the more general regulations to her. Thus, we find that the Secretary's consideration of the regulations pertaining specifically to experimentation involving

pregnant women and fetuses was subsumed within her review under section 1315. Furthermore, we defer to her implicit judgment that section 3.5 does not involve pregnant women or fetuses. We determine, too, that we also would conclude in a review of the matter without deference to the Secretary that section 3.5 does not involve pregnant women or fetuses within the meaning of 45 C.F.R. Part 46. Therefore, we will affirm the judgment of the district court on this point.

### B. THE SOCIAL SECURITY ACT

Appellants also challenge section 3.5's validity based upon its asserted incompatibility with the Social Security Act.

#### 1. Assistance to all Eligible Individuals

Section 402 of Title IV of the Social Security Act requires that a state AFDC plan must:

> provide that all individuals wishing to make application for aid to families with dependent children shall have [the] opportunity to do so, and that aid to families with dependent children shall . . . be furnished with reasonable promptness to all eligible individuals . . . .

42 U.S.C. § 602(a)(10)(A). The appellants claim that since section 3.5 is a state law that denies AFDC benefits to individual children who are eligible for AFDC under federal standards, it violates section 602(a)(10)(A).

The district court rejected the appellants' claim, stating that they had disregarded "one of the central tenets of the AFDC program, namely that `eligibility under the AFDC program has historically been premised upon the household as the basic unit of assistance.'" C.K. v. Shalala, 883 F. Supp. at 1010 (citations omitted). The court stated that where a household is receiving AFDC, all of the individuals within that household are receiving it, and that payments to one individual in a family generally are viewed as beneficial to the entire family. Id. The court thereafter concluded that while appellants had referred to section 3.5 as the "Child Exclusion" throughout their papers, that appellation is inaccurate:

> Under New Jersey's program, no child is excluded from benefits; rather, the additional child born to the AFDC recipient household simply partakes of the assistance already received by that household at the same monetary level. Thus, the Family Cap here is analogous to the maximum family payment upheld . . . by the Supreme Court in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153 (1970).

Id. The court analogized the New Jersey provision at issue in this case to that involved in Dandridge, stating that, like the maximum benefits payment in that case, section 3.5 imposes a benefits ceiling on the AFDC household. Any additional child born while that AFDC family is receiving payments simply will be included in the assistance unit and share in the benefits

accorded the rest of the household.  Thus, as in Dandridge, while the level of cash assistance flowing to the household will not increase with the birth of the additional child, the court found that it cannot be said that the additional child is denied benefits in toto.  Id.  Consequently, the district court held that there was no violation of section 602(a)(10)(A).  Id. at 1010-11.

Appellants argue that, unlike a family maximum, section 3.5 completely bars particular eligible children from receipt of AFDC.  They claim that under a family maximum, such as the program involved in Dandridge, when the oldest child in a large family becomes too old to receive AFDC, the family continues to receive the same level of benefits because the younger children's grants have not been rescinded totally.  Under section 3.5, however, appellants argue that when the oldest child becomes too old to receive AFDC, those benefits disappear; the excluded children never receive benefits because their eligibility has been eliminated completely.  Further, under the family maximum, appellants note, if a child in a large family is sent to live with a relative, the child can receive AFDC benefits because the child's eligibility never was rescinded.  Under section 3.5, however, they note that an "excluded child" cannot receive benefits no matter where he or she lives.  Br. at 34.

Earlier in this opinion, we noted that the Secretary has required of section 1315 waivers occurring subsequent to New Jersey's request that certain exceptions be made in provisions similar to section 3.5.  Of particular note here is the Secretary's requirement of an exception in the case of "a child who does not reside with his or her parent."  See br. of Puerto Rican Legal Defense and Education Fund, et al. at 30-31 n.25; discussion supra.  As we held there, we note again that it is within the Secretary's discretion to determine the wisdom of welfare reform programs in a piecemeal fashion.  She need not have required the exceptions to New Jersey's program that she required of later programs.  Thus, we agree with the district court that the AFDC benefits unit should be viewed as the household, and that, in general, much like the family maximum at issue in Dandridge, New Jersey's provision therefore does not deprive otherwise eligible individuals of benefits in violation of section 602(a)(10)(A).

There is, however, undeniable tension between the Court's conclusion in Dandridge (that, "[s]o long as some aid is provided to all eligible families and all eligible children, the statute itself is not violated," 397 U.S. at 481, 90 S.Ct. at 1159), and the potential operation of section 3.5 to deprive an otherwise eligible family with dependent children of any AFDC benefits -- rather than merely forcing the family to share a constant amount of benefits among more family members as in Dandridge.  If, for example, a caregiver does not qualify for additional AFDC benefits himself, and only the affected child lives with the caregiver, the otherwise "eligible" family of two would receive no AFDC money at all in apparent violation of section 602(a)(10)(A).

Despite this tension with the Court's language in

Dandridge, the FDP does not violate section 602(a)(10) because the Secretary expressly waived compliance with section 602(a) generally in order to allow New Jersey to implement the FDP's method for determining the proper amount of assistance, which necessarily includes the possibility mentioned above that an eligible family will receive zero benefits.

In relevant part, the waiver provisions of the Social Security Act explicitly provide that "the Secretary may waive compliance with any of the requirements of section . . . 602 . . . of this title . . . to the extent . . . he [or she] finds necessary to enable [the State] . . . to carry out [its] project."  42 U.S.C. § 1315(a)(1).  Thus, compliance with section 602(a)(10) is waivable.  Moreover, in granting New Jersey's waiver request, the Secretary explicitly waived compliance with section 602(a) to allow for "Differential Payments -- To allow the State to implement different methods for determining the amount of assistance for families in the FDP treatment group and the control group." App. at 34.  An eligible family in the "control group" would be paid according to the standard AFDC program, and thus always would receive some benefits.  An otherwise eligible family subject to the FDP, by contrast, always will receive the standard amount less the incremental amount due for the affected child -- which may work out to be zero if the family unit includes no other eligible children, parent or caregiver.  Such "differential payments" are precisely what the Secretary permitted in her general waiver of the contrary portions of section 602(a).

The general section 602(a) waiver indicates the Secretary's intent to allow New Jersey to provide zero additional money for an affected child, even if that means that some family units may receive no AFDC money at all.  The appellants argue that the Secretary can waive compliance with section 602(a)(10), if at all, only by explicitly referencing subsection (10) because payment of benefits to eligible families is at the "heart" of AFDC.  But the differential payments are at the "heart" of section 3.5.  Although the Secretary could have cited each relevant subsection of section 602(a) specifically in the waiver authority document, such specificity was not necessary: the waiver provisions clearly indicate the Secretary's intent to waive compliance with subsection 602(a)(10) insofar as that provision is inconsistent with the zero-additional-benefits provisions of the FDP.  See Aguayo, 473 F.2d at 1108 (concluding, where it was clear that the Secretary intended to waive compliance with a particular section, that "[i]t would elevate form over substance to issue a temporary injunction against the operation of these projects until the Secretary went through the formality of adding [the section] to the list of sections compliance with which was being waived").

In sum, we hold that the Secretary waived compliance with section 602(a)(10) insofar as to allow New Jersey to implement the FDP, and accordingly the program does not violate that section.  We will affirm this decision of the district court.

2.  Equitable Treatment Regulations

The appellants next assert that section 3.5 violates the principle that a state must treat eligible individuals and groups of residents on an equitable basis. HHS regulations provide that "eligibility conditions" in a state plan "must not exclude individuals or groups on an arbitrary or unreasonable basis, and must not result in inequitable treatment of individuals or groups in [ ] light of the provisions and purposes of the public assistance titles of the Social Security Act." 45 C.F.R. § 233.10(a)(1). Appellants claim that additional children born to AFDC recipients are denied benefits under section 3.5 based solely on what the state has deemed the "irresponsible" behavior of their parents. The district court, however, held that the section "does not operate to deny any child benefits, but instead simply requires that child to share in the cash payments allotted to his or her particular AFDC household." C.K. v. Shalala, 883 F. Supp. at 1011.

Appellants also claim that while states are free to set their own standard of need, their "determination of need and amount of assistance for all applicants and recipients [must] be made on an objective and equitable basis." 45 C.F.R. § 233.20(a)(1). They argue that section 3.5 violates this regulation because it affords different levels of cash assistance to families of identical size and need based upon a parent's decision to have a child while in receipt of AFDC. Br. at 35. The district court found no violation of this regulation, holding that "[t]he cap applies equally to all AFDC recipients who decide to conceive and give birth to another child since it went into effect," C.K. v. Shalala, 883 F. Supp. at 1011, and that "[t]he fact that there may be different levels of assistance given to families of equal size is potentially offset by the additional earned income disregards available to the affected families." Id.

We agree with the judgment of the district court that section 3.5 does not violate the HHS regulations regarding equitable treatment of aid recipients. Therefore, we will affirm the decision of that court with regard to this argument.

### 3. Work-Related Programs

Pursuant to 42 U.S.C. §§ 681-87, states participating in the AFDC program must establish and operate a "job opportunities and basic skills program," or JOBS. 42 U.S.C. § 682. The services and activities of JOBS include educational activities, job skills training, job readiness activities to help prepare participants for work, job development and job placement, job searches, on-the-job training, work supplementation programs, and community work experience. 42 U.S.C. § 682(d)(1)(A). In addition, a state also may offer post-secondary education in appropriate cases as well as such other education, training and employment as it may deem necessary. 42 U.S.C. § 682(d)(1)(B). The statute provides that, when assigning AFDC recipients to a JOBS program activity, a state must assure that "the conditions of participation are reasonable, taking into account in each case the proficiency of the participant and the child care and other supportive services needs of the participant." 42 U.S.C. § 684(a)(4). This requirement applies to "any work-related

programs and activities under this part, and under any other work-related programs and activities authorized . . . under section 1315 of this title." 42 U.S.C. § 684(e). Appellants claim that New Jersey here failed to assure the reasonableness of conditions of participation in FDP-JOBS by parents of children subject to section 3.5. Their argument is that:

> all parents of excluded children must participate in FDP-JOBS whether or not the conditions are `reasonable;' such parents must participate whether or not they have the capacity to work, are disabled, can find work, have the ability and proficiency to participate in FDP-JOBS, have a need for child care and other supportive services in order to work or participate in FDP-JOBS, or have a need to remain home and care for a newborn child.

Br. at 37.

With respect to this claim of the appellants, we agree with the district court that section 684 establishes that the provision is intended to regulate job placement programs, but not changes in benefit levels or work incentives based upon the relaxation of earned income limits. As the court stated, "[a] benefit cut, no matter what its purpose, is not a `program' or `activity' offered by the State to assure that needy families obtain education, training and employment." C.K. v. Shalala, 883 F. Supp. at 1012 (quoting Beno v. Shalala, 853 F. Supp. 1195, 1215 (E.D. Cal. 1993)). We agree with the district court's assessment of this issue and find no need to alter this part of its opinion.

### 4. Family Planning Services

Appellants claim that section 3.5 is a "family planning service" subject to section 402(a)(15) of the Social Security Act, 42 U.S.C. § 602(a)(15), which requires state AFDC programs to offer voluntary plans "for preventing or reducing the incidence of births out of wedlock and otherwise strengthening family life." Section 3.5, they argue, is a compulsory family planning service since it seeks to deter pregnancy in all women who receive AFDC. Thus, they argue that the section does not afford AFDC recipients the information and opportunity to make informed, voluntary family planning choices, but imposes a coercive family planning regime in violation of section 602(a)(15). Br. at 38.

The district court did not agree with the appellants' claims. The court noted that section 602(a)(15), by its terms, is directed at requiring a state to provide birth control services to those AFDC recipients who seek them. It stated that section 3.5, however, addresses the problem of "births out of wedlock" by adjusting benefit levels. Thus, while some AFDC recipients may avail themselves of family planning services provided under section 602(a)(15) given the imposition of the cap, the court found that the cap itself cannot be construed as one of those services. While not commenting on the district court's assessment of section 3.5 as addressing "births out of

wedlock," we agree with the court's decision that New Jersey's provision is not a family planning service within the meaning of section 602(a)(15).  Thus, we will affirm this holding of that court.

## IV.  CONSTITUTIONAL ARGUMENTS

Finally, appellants argue that section 3.5 impermissibly interferes with their rights to due process and equal protection of the laws.  They argue that the cap is irrational and illegitimate because it penalizes children for the behavior of their parents.  In addition, they assert that the section should be subjected to, and fails, strict scrutiny review, since the state's "overriding" purpose in enacting the section (deterring childbirth by welfare recipients) is an illegitimate goal sought to be realized by broad and overly intrusive means.  The district court decided that New Jersey's welfare cap is rationally related to a legitimate governmental purpose, in that the state's interests in giving AFDC recipients the same structure of incentives as working people, promoting individual responsibility, and strengthening and stabilizing the family unit are clearly legitimate.  C.K. v. Shalala, 883 F. Supp. at 1013.  Further, the court decided that the case does not present a situation where New Jersey unduly has burdened the procreative choice of the plaintiff class, since section 3.5 "in no way conditions receipt of benefits upon plaintiffs' reproductive choices."  Id. at 1014.  Accordingly, the court found that section 3.5 does not infringe appellants' procreative rights.

We have nothing to add to the district court's opinion on this point except to observe that it would be remarkable to hold that a state's failure to subsidize a reproductive choice burdens that choice.  In short, there are no constitutional implications when the state does not pay a benefit to parents who have a child that it would not pay to parents who did not have a child.  Rather than burdening the procreative choice of the plaintiff class, section 3.5 is neutral with respect to that choice.

Lastly, the court found that New Jersey's welfare reform efforts are rationally related to the legitimate state interests of "altering the cycle of welfare dependency that it has determined AFDC engenders in its recipients as well as promoting individual responsibility and family stability."  Id.at 1015.  We see no reason to disturb these holdings of the district court, and will therefore affirm its decision as described herein.

## V.  CONCLUSION

For all the foregoing reasons, we will affirm the judgment of the district court.